**William Edgar BOWEN, Petitioner**

v.

**Steve HANEY, Warden, Respondent.**

**Civil Action No. 3:07CV–375–H.**

United States District Court,
W.D. Kentucky,
at Louisville.

April 8, 2008.

**520**

John K. Carter, LaGrange, KY, Samuel Manly, Louisville, KY, for Petitioner.

Gregory C. Fuchs, Kentucky Attorney General, Frankfort, KY, for Respondent.

## MEMORANDUM OPINION AND ORDER

JOHN G. HEYBURN, II, Chief District Judge.

Petitioner has objected to the Magistrate Judge's Findings of Fact, Conclusions of Law and Recommendations regarding his petition for writ of habeas corpus under 28 U.S.C. § 2254. The Magistrate Judge recommends that the petition be dismissed. The Court has review all of Petitioner's objections to the report.

The Magistrate Judge has written a thorough opinion summarizing all the evidence and considering every disputed factual and legal issue. The Court agrees completely with the overall scope and specific conclusions of that opinion.

The two most controversial issues appear to concern the admission of the taped statement by Petitioner and the trial court's refusal to grant a continuance due to the death of Petitioner's proposed expert. The taped statement certainly does contain relevant material. It is certainly relevant that Petitioner masturbated in the same room where the victim slept and possibly did so on the person of the victim. Finally, the Court finds no violation of the Constitution or a fundamental fairness by the manner in which the trial court handled the motion in limine to exclude Petitioner's expert. That proposed expert testimony would appear to have been an improper comment on Petitioner's guilt or innocence. This Court believes that the manner was properly analyzed by the Kentucky Supreme Court and the United States Magistrate Judge. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the Magistrate Judge's Findings of Fact, Conclusions of Law and Recommendations are AFFIRMED and the petition is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Petitioner's request for certificate of appealability is DENIED.

This is a final and appealable order.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND RECOMMENDATION

DAVE WHALIN, United States Magistrate Judge.

### INTRODUCTION

Petitioner William Edgar Bowen, Jr., is a Kentucky prisoner now serving a 20-year term of imprisonment at the Northpoint Training Center in Burgin, Kentucky. In 2003, a jury seated in circuit court of Bullitt County, Kentucky, convicted Bowen of sexual abuse in the first degree and sodomy in the first degree of a 12–year–old female, J.S., who claimed that Bowen sexually abused her in his home between 1992 and 1995.

Petitioner Bowen now challenges the constitutionality of his conviction on the grounds that: (1) the evidence offered at trial was constitutionally insufficient to establish his guilt; (2) his due process right to a fundamentally fair trial was denied by the improper admission of his pre-arrest taped statement; and (3) the trial court denied him his constitutional right to present a complete defense when it refused to grant him a continuance immediately prior to trial to obtain a replacement expert witness after his sole expert died unexpectedly.

Warden Steve Haney has filed a motion for summary judgment in which he argues that Petitioner Bowen's application for habeas corpus relief must be dismissed with prejudice because the decision of the Supreme Court of Kentucky that affirmed his conviction is neither contrary to nor an unreasonable application of any clearly established precedent of the U.S. Supreme Court. Petitioner Bowen has filed a response in opposition. The Court has fully reviewed the state court record and trial transcript. Based on its review, the Magistrate Judge recommends that the petition be dismissed with prejudice and that Petitioner Bowen be denied a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1).

## FINDINGS OF FACT

### I. Procedural History.

On April 30, 2002, a state grand jury seated in Bullitt County, Kentucky, returned a two-count indictment against Petitioner Bowen (Transcript of Record (Tr. Vol. 1, pp. 15–16)). Count 1 charged that Bowen committed the offense of sexual abuse in the first degree by engaging in sexual contact with J.S., a female less than 12 years of age, beginning on or about November 1992, and continuing through December of 1995. (*Id.*). Count 2 charged that Bowen committed the offense of sodomy in the first degree by engaging in deviant sexual intercourse with J.S. during the same three-year period. (*Id.*). Bowen entered a plea of not guilty at arraignment on May 20, 2002, and was released on bond pending trial. (Tr. Vol. 1, p. 44). Trial was set to commence on December 17, 2002. (*Id.* at 57).

### a. Motions in Limine.

Prior to trial, Bowen moved to exclude all hearsay testimony concerning out-of-court statements made by the victim, J. S., to Kentucky State Police (KSP) Detective Jonathan Tapp, or to any other witness called by the Commonwealth. (Tr. Vol.1, p. 92). Bowen additionally sought to suppress from evidence an audiotape recorded interview he had given to KSP Detective Tapp at his home on April 2, 2002, because the tape was irrelevant, "nonconfessory," and unfairly prejudicial to the defense. Attached to the motion was a transcript of the tape recorded statement. (Tr. Vol.1, pp. 95–100). The transcript revealed that, after being advised of his *Miranda* rights, Petitioner Bowen acknowledged that it was possible that J.S. had witnessed him masturbating in the bedroom at his home. He also acknowledged that he kept some adult magazines in the bedroom. When asked during the recorded interview if it was possible that he went into the same bedroom to masturbate with the lights off while J.S. was napping in there, Bowen responded that such a situation was "very possible, very possible...." (*Id.* at 96). When asked if J.S. ever put her mouth on his penis, Bowen responded, "I wouldn't think so. No, just flat no. I can't see where that would be possible, even if I was sleeping." (*Id.* at 97).[1]

---

**1.** Unknown to Bowen, J.S. had earlier that day advised Detective Tapp and Mary Ellen

Murray, a local social worker for the Ken-

Faced with this motion, the trial court set a suppression hearing for November 22, 2002. (Tr. Vol. 1, p. 101). On the scheduled hearing date, Petitioner Bowen's counsel provided the court a memorandum in support of his motion in limine. (Tr. Vol. 1, pp. 138–149). The Commonwealth filed its own memorandum five days later. (Tr. Vol. 1, pp. 103–137). Counsel argued about whether the recorded statement was relevant under Kentucky Rule of Evidence (KRE) 401 and whether its probative value was substantially outweighed by the danger of undue prejudice so as to justify exclusion under KRE 403. The prosecutor's position was that the taped statement was highly relevant, and not unduly prejudicial, because the Defendant admitted that he masturbated in the bedroom, where the victim alleged that the offense occurred, admitted that the victim took naps in this bedroom, and that he may not have seen her there while he was masturbating. The prosecutor also pointed out that Petitioner Bowen's response to the detective's question concerning possible genital contact with the victim's mouth was initially equivocal.

Defense counsel maintained that the recorded statement, at most, showed merely a proclivity for masturbation. Whether the victim may have observed any such activity did not tend in any fashion to prove the charges against the Petitioner, which he denied in his taped statement. Even if the statement were relevant, defense counsel insisted that its minimal probative value was substantially outweighed by the danger of undue prejudice. The recorded statement, reasoned the defense,

was inadmissible as other bad acts under KRE 404(b) to prove the character of the Petitioner, who was never advised prior to giving his recorded statement of the nature of the accusations or the time at which these alleged events supposedly occurred 7–9 years earlier.

On December 3, 2002, the trial court entered a brief order in which it rejected the Petitioner's argument that the probative value of his recorded statement was substantially outweighed by the danger of undue prejudice. (Tr. Vol. 2, p. 196). Immediately following this ruling, Petitioner's attorney moved the trial court to continue the scheduled trial date from December 17, 2002, due to the scheduled foot surgery of the Petitioner's sole expert witness, Dr. Richard Gardner, a licensed psychiatrist, who counsel characterized as being "an indispensable witness for Defendant." (*Id.* at 205). Attached to the motion to continue was the affidavit of Dr. Gardner, a Board certified child psychiatrist and medical college faculty member of Columbia University, who averred in his affidavit that based upon his interview with Petitioner Bowen, Bowen's spouse and his examination of the audiotape recorded statement, his opinion was that "It is highly unlikely that he [Petitioner Bowen] perpetrated the alleged pedophilic acts." (*Id.* at 209).

This defense motion resulted in a motion in limine by the prosecution to exclude the testimony of Dr. Gardner. (Tr. Vol. 2, pp. 219–264). Specifically, the prosecution moved the exclude any mental health professional, including Dr. Gardner, from tes-

---

tucky Cabinet for Families and Children, that between the ages of 4 and 7, while at the Bowen home seven years prior, Petitioner Bowen had masturbated to orgasm on her stomach as she lay on the bed in the same bedroom, and on one later occasion, had forced his penis into her mouth in the kitchen of the home while he was seated at the kitch-

en table wearing only a shirt and green boxer shorts. At trial, Petitioner Bowen maintained that he was never advised of the exact nature of J.S.'s accusations at the time of the tape recorded statement and was unaware that she had accused him of criminal sexual conduct that allegedly occurred a minimum of seven years earlier.

tifying that the psychological profile of Petitioner Bowen was inconsistent with that of a sex offender or offering an opinion as to whether Bowen committed the charged acts in the indictment. The prosecution based its motion, in part, on the argument that the question of whether Petitioner Bowen committed the charged acts was a question of fact solely within the province of the jury and not a proper subject for expert testimony. The prosecutor further argued that the proffered expert opinion was neither relevant nor reliable. (Tr. Vol. 2, pp. 219–264).

Faced with this motion, the trial court ordered the parties to furnish it with additional authority on the question of whether a *Daubert* hearing was necessary in light of the prosecution's motion in limine. (Tr. Vol. 2, p. 265). The trial court entered a separate order that continued the jury trial to February 27, 2003. (*Id.* at 266). In compliance with the order of the trial court, the prosecution filed a copy of the opinion of the Kentucky Supreme Court rendered in *Tungate v. Commonwealth,* 901 S.W.2d 41 (Ky.1995) in which the Supreme Court upheld the exclusion in a separate prosecution of the same pedophile profile testimony by Dr. Gardner as being an invasion of the province of the jury and unreliable. (Tr. Vol. 2, pp. 267–77).

Petitioner Bowen's attorney responded with a memorandum of law in which he argued that a hearing pursuant to *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and KRE 702 was required to determine whether Dr. Gardner's proposed expert testimony was based on scientific knowledge that would assist the trier of fact to understand a fact at issue. (Tr. Vol. 2, p. 278–300). According to the defense, the proposed expert testimony of Dr. Gardner was highly relevant as pedophilia is a recognized sexual disorder which is capable of diagnosis; consequent-

ly, an expert opinion that Petitioner Bowen did not meet the criteria for pedophilia, and therefore was unlikely to commit any pedophilic act, was clearly relevant and admissible. (*Id.* at 279). Defense counsel argued in this regard that if the Petitioner's proclivity to masturbate, as suggested by his tape recorded interview, was admissible, then his non-proclivity for pedophilic sex acts must also be as relevant and admissible. (*Id.* at 280). Counsel added that Kentucky has abandoned the "ultimate issue" exclusionary rule previously relied on in the *Tungate* decision to exclude Dr. Gardner's expert testimony on pedophilic characteristics in an earlier criminal trial. (*Id.* at 280–282).

### b. The *Daubert* Proceedings.

On January 3, 2003, the trial court scheduled a *Daubert* hearing for February 27, 2003. (Tr. Vol. 3, p. 360). It rescheduled both the hearing and the jury trial to commence on May 27, 2003, to afford the prosecution additional time to secure its own expert witness. (*Id.* at 362). The trial court then ordered the defense to provide reciprocal discovery to the prosecution. (Tr. Vol. 3, p. 376). The defense provided the prosecutor with a copy of Dr. Gardner's report on May 1, 2003. (Tr. Vol. 3, p. 377). The prosecution was ordered by the Court on May 19, 2003, to produce to the defense a copy of any reports of physical or mental examinations made in connection with the case. (*Id.* at 380). The prosecution then provided the defense with a copy of the *curriculum vitae* and biography of its own expert, Harvard-trained clinical psychologist Anna Salter, Ph.D., who the prosecutor advised the court was expected to testify that no scientific means exist to reliably determine the common characteristics of a pedophile. (*Id.* at 381–87).

As noted, the court rescheduled the *Daubert* hearing for the morning of trial. Unfortunately, over the weekend preceding the scheduled start of trial, Dr. Gardner began to experience extreme pain related to his prior foot surgery. He advised Petitioner Bowen's trial counsel that he would not be able to attend the scheduled *Daubert* hearing, but offered to testify by telephone. As the doctor's physical condition continued to deteriorate, he contacted trial counsel on Sunday, May 25, 2003, to advise that his pain was so severe that he would not be able even to testify by telephone. Bowen's attorney attempted to contact opposing counsel by telephone the same day and filed an immediate motion pursuant to Kentucky Rule of Criminal Procedure (RCr) 9.04 to continue the scheduled start of trial.

Counsel included with his motion an affidavit setting out the anticipated expert testimony of Dr. Gardner that masturbation is not considered to be deviant sexual behavior, nor an indication of a proclivity for sexual abuse. (Tr. Vol. 3, pp. 415–445). Along with this motion, Bowen's trial counsel renewed his motion to suppress the audiotape of Detective Tapp's interview with the Defendant (*Id.* at 389–414, 484–86) and the motion to exclude any hearsay comment or opinions regarding such taped statement. (Tr. Vol. 3, pp. 446–448, 449–483).

On the morning of trial, counsel appeared before the court for the purpose of conducting a *Daubert* hearing. (Transcript of Evidence (TE) Vol. I, p. 3). At the outset, Petitioner Bowen's attorney requested that the Court continue the trial date to allow Dr. Gardner sufficient time to physically recover so that he could personally attend and testify at a future date. (TE, Vol. I, pp. 3–5). The defense explained to the court its desire for Dr. Gardner to personally attend so that the Court could evaluate his credibility face-to-face and take testimony on the basis of the conclusions contained in Dr. Gardner's 60–page report, which previously had been provided to the Court.

The defense acknowledged that under *Pendleton,* 685 S.W.2d 549 (Ky.1985), the Supreme Court of Kentucky had previously "declined to permit the admission of the kind of testimony that Dr. Gardner is going to give in this case." (TE, Vol. I, p. 7). Counsel argued, however, that the dissent of Justice Leibson in *Pendleton* was now the judicial view in Kentucky—that to deny a defendant expert testimony of his mental condition, so as to establish that he does not possess the type of mind set of an individual who would perpetrate such a crime—would violate the defendant's constitutional right to confront the evidence against him. (*Id.* at 7).

Petitioner Bowen's attorney argued to the court that his client's defense would be extremely prejudiced if Dr. Gardner was denied the opportunity to personally attend so as to testify at the scheduled *Daubert* hearing and later at trial. (*Id.* at 8). Unknown to counsel and the court at that time was that Dr. Gardner had died unexpectedly the prior day, thus rendering him unavailable in all senses of the term.

In response to the arguments of defense counsel, the court explained that the most recent Kentucky Supreme Court decision to discuss the requirements of a *Daubert* hearing was *Commonwealth v. Christie,* 98 S.W.3d 485 (Ky.2002) in which the trial court excluded expert testimony regarding eyewitness identification without conducting a *Daubert* hearing (TE, Vol. I, p. 9). The trial court explained that *Christie* holds that a trial court in such circumstances should only rule on the admissibility of expert testimony without first holding a *Daubert* hearing when the record is complete enough to measure the proposed testimony against the proper standards of

reliability and diligence, such as where the record contains the proposed expert's reports, affidavits, deposition testimony and the like. (*Id.* at 9–10).

The prosecution immediately followed the court's comments with its view that Justice Leibson's dissent in *Pendleton* is not the law in Kentucky. Rather, the court was better guided by the previously mentioned *Tungate* decision. (*Id.* at 11). The prosecutor further advised that the state had retained at some expense its own expert, Dr. Salter, who intended to testify that Dr. Gardner's conclusions concerning application of a "pedophile profile" were far outside the mainstream of scientific opinion. Given that the trial court had access to Dr. Gardner's expert report and affidavit, the prosecution argued that it had sufficient record before it to conduct a *Daubert* hearing without Dr. Gardner's presence, particularly in light of the *Tungate* decision excluding the same proposed expert testimony by Dr. Gardner. (TE, Vol. I, pp. 12–13).

This argument led the defense to respond that the *Tungate* decision was decided under the prior *Frye* standard for admission of expert testimony and focused on the subsequently abandoned "ultimate issue" test. Petitioner Bowen's trial attorney pointed out that almost ten years had passed since Dr. Gardner had proffered expert testimony in the *Tungate* trial; therefore, the evidence offered in support of his conclusions may well have changed. (*Id.* at 13–14). The defense protested that the doctor's report was not a substitute for his testimony, which would involve the basis for the evaluation contained in the expert report and the criteria used. (*Id.* at 14). Counsel concluded that to deny the defense the opportunity to have Dr. Gardner testify would deny Petitioner Bowen his fundamental right to a fair trial and his right to present evidence to refute the prosecution's case in violation of the Sixth

Amendment to the U.S. Constitution and § 11 of the Kentucky Constitution. (*Id.* at 15).

Faced with these oral arguments, the trial court responded that the *Tungate* opinion addressed more than merely the "ultimate issue" basis. It also held that the "testimony and conclusions of Dr. Gardner lacked sufficient scientific basis for the opinions offered. . . ." (TE, Vol. I, p. 16). Bowen's attorney responded with, "I admit that, Judge, and there is no question about that." (*Id.*). Counsel continued to add, however, that given the passage of time, the scientific basis for Dr. Gardner's current report may well be significantly altered. (TE, Vol. I, p. 16–17). Counsel pointed out that Dr. Gardner used the same scientific criteria in his tendered expert report that are used to evaluate convicted prisoners and that the Kentucky Cabinet for Human Services uses the same type of profile determination to evaluate sexual abuse allegations. (*Id.* at 17–18).

The trial court initially expressed its concern that if it ruled on the admissibility of Dr. Gardner's proposed expert testimony based solely on his report, then a strong possibility existed that "the Court of Appeals or the Supreme Court will reverse this case. . . ." (*Id.* at 18). Nevertheless, the Court continued to observe that based on its knowledge of the law it did not believe that Dr. Gardner's testimony would be admissible. (*Id.* at 19). The court then reviewed Dr. Gardner's report. (*Id.*). It noted that nothing indicated yet whether the prosecution would even use the term "pedophile" during the Petitioner's trial. (*Id.* at 20). After the Commonwealth advised that it did not believe that the term "pedophile" would be used, the court ordered the report of Dr. Gardner to be filed in the record and ruled that it would proceed with the *Daubert* hearing without the doctor's presence.

Based on its review of the report, the court observed that the entire report ran to the issue of pedophilia; however, no requirement existed that the prosecution establish that Defendant Bowen was a pedophile in order to convict him of sexual abuse in the first degree and sodomy in the first degree. (*Id.* at 20–21). Accordingly, the court concluded, "Whether or not this defendant is a pedophile, I don't think really has anything to do with this case." (*Id.* at 21).

This ruling led the defense to reiterate that Defendant had a right to have Dr. Gardner present given that his report did not encompass the full scope of his anticipated testimony, which included the protocol and basis for his findings. (*Id.*). Further, the defense noted that Detective Tapp in his own report had used the term "pedophile." Defense counsel observed that if Dr. Gardner were not permitted to testify to the mental condition of Petitioner, then the Petitioner would be denied his right to present a defense to a bare allegation that he committed sexual abuse and sodomy, thereby turning the trial into a swearing match. (TE, Vol. I, p. 22).

The trial court, for its part, restated its own view regarding the relevance of Dr. Gardner's report, stating:

> But in reading Dr. Gardner's report, his entire report—to repeat myself—addresses the various factors that go to making up or not making up the personality of a pedophile. And I don't see that pedophilia necessarily has anything to do with this case.
>
> . . . .
>
> In the opinion of the court this proffered testimony by Dr. Gardner is so outside the realm of the proof required to show that these crimes were committed, and this defendant committed them, should not under any circumstances be admissible.
>
> . . . .

You're offering Dr. Gardner's testimony to show this man doesn't have the profile of a pedophile. I keep hammering home the fact that he's not charged with being a pedophile. He is charged with sodomy of a 12–year–old child and sexual abuse in the first degree.

(TR, Vol. 1, pp. 24–26).

The trial court then granted counsel a brief recess to discuss the situation among themselves, upon which they returned to advise the trial court that they had just learned of Dr. Gardner's untimely death. (*Id.* at 27). Defense counsel then renewed his motion to continue the trial, as "The defendant is totally without what he expected to be expert testimony in his behalf." (*Id.* at 28). Defense counsel requested additional time to obtain a substitute expert witness who would examine the Petitioner to "determine whether or not [he] . . . meets the criteria of a sex abuser. And whether or not [he] . . . possess[es] the mental condition that influence[s] his [. . .] perpetration of that kind of offense on a young child." (*Id.* at 28). Defense counsel added that although the trial court had concluded that Dr. Gardner's report did not satisfy the *Daubert* standard, the Court might reach a different conclusion after hearing the testimony of a different expert witness for the defense. (*Id.* at 29).

The prosecutor responded that such a scenario would merely put the court in the exact same situation concerning the admissibility of the proposed expert testimony that it now faced since, in the prosecutor's view, Kentucky law did not permit the admission of such expert testimony regardless of its source. (*Id.* at 30). The court agreed with the prosecution that to allow testimony of this nature would "open a can of worms" in which any defendant charged with a specific crime, i.e., murder or robbery, would retain an expert witness

to testify that he or she did not fit .the profile of a person who murders or robs. (*Id.* at 30–310).

With these arguments, the court denied the motion of the defense for a continuance. (*Id.* at 313). The trial court again denied Petitioner Bowen's renewed pretrial motion to suppress the tape recorded statement taken by Detective Tapp.

#### c. The Trial Proceedings.

Trial of the case proceeded over several days. Testimony for the prosecution, summarized below, consisted of testimony from the victim, J.S., her mother P.S., and Detective Tapp. Petitioner Bowen's trial counsel unsuccessfully moved for a directed verdict at the conclusion of the prosecution's case based on the alleged insufficiency of the witness's testimony. Petitioner Bowen testified in his own defense, along with his wife, Myrtle, and sons. He additionally presented the testimony of numerous individuals whose children were cared for by Mrs. Bowen in her home for many years without incident and without indication of any child sexual abuse. Despite this testimony, and that of Petitioner Bowen denying all of the allegations, the jury ultimately convicted the Petitioner on both counts of the indictment. Petitioner Bowen then chose to waive jury sentencing. He was instead sentenced by the trial court, based on the recommendation of the prosecution, to concurrent sentences of 5 and 20 years on the sexual abuse and sodomy charges, respectively.

#### d. The Direct Appeal.

Petitioner Bowen took a direct appeal to the Supreme Court of Kentucky (DN 12, Exh. 12, Memorandum Opinion). Petitioner raised five issues on appeal. He argued that the trial court improperly denied: (1) his motion to suppress the audio taped statement taken by Detective Tapp; (2) him the opportunity to play the same statement to the jury during voir dire and opening statements; (3) his motion for a continuance immediately prior to trial in order to secure a new expert witness; (4) his motion for a directed verdict; and (5) his motion to introduce a photograph showing a table similar to the kitchen table testified to by the victim.

The Kentucky Supreme Court rejected all of these arguments. As to the tape recorded statement, the Court concluded that the statement was properly admitted as it was probative of the crimes charged, despite its lack of a time reference, and its probative value was not outweighed by any undue prejudice. As for the Petitioner's continuance related argument involving the loss of Dr. Gardner's expert testimony, the Kentucky Supreme Court concluded that the trial court in fact had held a *Daubert* hearing given its review of Dr. Gardner's report and lengthy affidavit outlining his proposed testimony, along with its consideration of the controlling state case law. Citing the *Christie* decision, the Kentucky Supreme Court found that the record contained sufficient evidence for the trial court's *Daubert* determination, which it held to be properly based on the *Tungate* decision. Given the inadmissibility of this expert testimony, the Kentucky Supreme Court concluded that a continuance of the trial was unnecessary, since the same type of expert testimony offered by a new expert witness would be no more admissible than Dr. Gardner's expert testimony. Finally, the Kentucky Supreme Court indicated that, while certain of the trial testimony offered by J.S. did conflict with her prior statements, and was itself internally inconsistent, it could not be said that it was clearly unreasonable for the jury to find Petitioner Bowen guilty of the charged offenses. The Court therefore concluded that a rational trier of fact could have believed, based solely on the testimony of J.S., that the Petitioner committed

the charged sexual abuse and sodomy offenses.

## II. Trial Testimony.

### a. The Prosecution's Proof.

Trial began on May 27, 2002. The prosecution initially called the victim, J.S., as its first witness. J.S., who was 14 years old at the time of trial, testified that she was sexually molested by Petitioner Bowen. She claimed that Bowen molested her at his home between 1992 and 1995, when she was 4-to-7 years old (T.E. Vol. I, pp. 105–106). J.S. explained that her parents left her at the Bowen home for daycare with the Petitioner's wife, Myrtle Bowen, who cared for children in her Bullitt County home for many years to make extra money. (T.E. Vol. I, p. 6; Vol. II, pp. 145–154).

When asked how she was molested, J.S. elaborated that on one occasion, while Mrs. Bowen and her helper, Cindy, were out of the home, J.S. was lying alone on the bed in a bedroom for an afternoon nap when Petitioner Bowen entered the room, raised up her shirt and proceeded to masturbate until he ejaculated on her stomach, after which he took J.S. to the bathroom, washed her off, laid her back on the bed and told her not to tell anyone. (T.E. Vol. I, pp. 107–109). J.S. estimated that she was 5 years old when the event occurred and that the bedroom in which it occurred was then used by the Bowens' two sons. (*Id.* at 109). Further, Petitioner Bowen, according to J.S., had his own dresser in the bedroom in which he kept Playboy magazines. (*Id.*).

J.S. continued to testify about a separate incident that occurred when she was six or seven years old. (T.E. Vol. I, p. 110). J.S. explained that on one occasion in the Bowen home she was underneath the kitchen table playing with the family dog when the Petitioner, who was seated at the table wearing only green boxer shorts and a dress shirt, took out his penis and forced J.S.'s mouth down onto it. (*Id.* at 111). When J.S. began to choke and started to cry, Petitioner Bowen allegedly removed his penis from her mouth and cautioned her not to tell anyone. (*Id.*). J.S., in fact, did not tell anyone until seven years later on March 27, 2002.(*Id.*). She explained that she continued to come to the Bowen home over the ensuing years because she loved Myrtle Bowen and enjoyed being with the other, younger children there. (*Id.* at 112). Mrs. Bowen babysat for other children, all of whom were younger than J.S. (*Id.* at 113). J.S. helped with feeding the babies, changing their diapers and watching them. (*Id.*).

When she became 12 years old, J.S. moved away from the county where the Bowens lived and no longer stayed with them, except for occasional visits during the summer or on school breaks at Christmas. (*Id.* at 114). Her parents got divorced, and her mother had remarried first. Mrs. Bowen in her own testimony recalled that J.S. had a difficult time adjusting to the divorce and to having a stepfather.

J.S. also testified to a separate incident that occurred during the Christmas break of 2001. She was seated on the couch in the TV room at the Bowen house watching television with Petitioner Bowen, whom she called "Eddie," when he told J.S. that years earlier a 9-year-old girl had come over to his home and asked him crudely if he wanted to have sex with her. (T.E. Vol. I, p. 115). According to J.S., Bowen did not explain why he was telling her about this event. He then allegedly asked J.S. if she had ever had sex. (*Id.*). She responded that she had not because she was only 13 years old. (*Id.*). Petitioner Bowen then supposedly told her that he and his wife had not had sex in eight months. (*Id.*). It was after these events in Decem-

ber of 2001, that J.S. decided at church in March to tell her best friend what had occurred. (*Id.* at 116). Several weeks later, she told her mother on March 27, 2002. (*Id.*).

On cross-examination, J.S. testified that she had stayed at the Bowen home from the time that she was 2 years old, until she was 12. (*Id.* at 117). J.S. acknowledged that even though the sexual abuse supposedly occurred between the time she was 4 and 7 years old, she continued to come to the Bowen home for babysitting until she was 12. (*Id.* at 118). She reiterated that the incident in the bedroom occurred in the same bedroom in which Petitioner Bowen slept where his dresser was located. (*Id.* at 119). She agreed that there were other children in the home on that first occasion, but explained that they were asleep in different rooms of the house at the time. (*Id.*).

J.S. estimated that the second incident in the kitchen occurred at approximately 3 p.m., immediately prior to the time that the Petitioner would go to work. (*Id.* at 121). She explained that on that separate occasion all of the children were in another part of the house with Myrtle Bowen while she was playing under the table with the dog. (*Id.*). J.S. acknowledged that there was no door to the kitchen, which could be seen from the hallway. (*Id.* at 123). Further, she acknowledged that parents would come to the home to pick up their children at different times, some after school, others after their parents got off work. (*Id.* at 123). She also admitted that on occasion these parents went beyond the front room of the home when picking up their children. (*Id.* at 124). Finally, J.S. acknowledged that she helped Myrtle Bowen with the laundry and knew that her husband owned a green pair of shorts, which he would wear around the house. (*Id.* at 126–27).

J.S. was then confronted with a handwritten letter that she had written Myrtle Bowen in October of 2001. (*Id.* at 131). In her letter, which J.S. read aloud to the jury, she wrote that she missed Mrs. Bowen and missed being at the Bowen house because Mrs. Bowen was "like a second mom" that she could always rely on. (*Id.*). J.S. added in her letter to tell Eddie "hello," along with her grandchildren. (*Id.* at 132).

J.S. acknowledged that she had spoken with KSP Detective Tapp and social services worker Mary Ellen Murray. (*Id.* at 133–34). During her 2–hour long meeting, she attempted to tell them what had occurred, but became too emotional to speak, so she wrote out a statement. (*Id.*). J.S. also wrote out what Petitioner Bowen had allegedly said to her concerning his sex life during her Christmas break visit. She admitted that there were other children in the Bowen home at the time this third incident occurred in 2001. (*Id.* at 136).

Concerning her written statement to Detective Tapp, J.S. testified on redirect that her written statement did not contain all of the abuse that occurred because she did not begin writing down what had happened until after she became unable to speak. (*Id.* at 139–140). J.S. confirmed that she told Detective Tapp that Petitioner Bowen asked her several years later, when she was six years old, if she would perform oral sex for him, but she said no, adding that she was stupid when she was younger. (*Id.* at 140). J.S. continued in her re-direct testimony to verify the events she told the detective and social worker. (T.E. Vol. I, pp. 140–141).

J.S.'s mother, J.P., then testified. (T.E. Vol. II, pp. 5–15). J.P. testified that she took her daughter to Myrtle Bowen's home five days a week from the age of 2 until she was 12. (*Id.* at 7–8). As J.P. described matters, her daughter "loved Myr-

tle to death." (*Id.* at 8). She always talked about Myrtle and her two sons, Aaron and Matthew. (*Id.*). J.P. did not testify to any of the circumstances surrounding the alleged incident.

After J.P. testified, the prosecution recalled J.S. to ask her whether she remembered advising Detective Tapp that Petitioner Bowen would make her sit on his hand when she tried to sit on the couch in the Bowen home. (T.E. Vol. II, p. 25). J.S. acknowledged that Petitioner would try to squeeze her buttocks when she sat on the couch, but she denied that his fingers ever went into her rectum, as Detective Tapp had written in his report. (*Id.*). She confirmed that the Petitioner had merely squeezed her buttocks, which according to J.S., he did almost every time that she went to the Bowen home, including the last time she was there in December of 2001, over Christmas break. (*Id.* at 26). J.S. reiterated on cross-examination that she did not tell Detective Tapp that the Petitioner stuck his fingers into her butt. (*Id.* at 27).

J.S. disagreed that she had earlier testified she was four years old when the kitchen incident occurred; instead, she testified that she was six or seven. (*Id.*). Further, J.S. testified, also contrary to her earlier trial testimony, that she was about 12 years old when the Petitioner asked her to fellate him again. (*Id.* at 28). J.S. repeatedly denied any contradiction with her earlier testimony on this point. (*Id.*). When defense counsel read Detective Tapp's statement referring to the Petitioner's alleged request for fellatio when J.S. was six years old, she testified that the Detective must have misunderstood her, as she was older than six years old. (*Id.* at 30–31). Instead, she was 12 years old. (*Id.* at 31). J.S. admitted that while she and Myrtle Bowen did talk about certain "girl things," such as inappropriate touching, she never told Mrs. Bowen what her husband had allegedly done to her. (*Id.* at 34).

Detective Jonathan Tapp then testified. (T.E. Vol. II, p. 42). Detective Tapp testified that on April 2, 2002, he had occasion to respond to an inquiry from the Kentucky Cabinet for Human Resources concerning Petitioner Bowen. (*Id.* at 43). His immediate supervisor with the KSP detailed Tapp to investigate a complaint sent to the state police by social worker Mary Ellen Murray concerning alleged child sexual abuse. Detective Tapp met with J.S. and her mother, along with social worker Murray, on April 2, at the Cabinet for Families and Children in Shepherdsville, Kentucky. (*Id.* at 44).

After the interview with J.S., Detective Tapp and Mary Murray went to the Bowen home where Tapp interviewed Mr. Bowen. (*Id.* at 44–45). According to the detective, he and the Petitioner walked around the home briefly and then went to Aaron and Matthew's bedroom where the detective spoke with Petitioner Bowen "for a minute before Bowen suggested that they talk outside in the garage." (*Id.* at 45). Outside in the garage is where the detective took an audiotape recorded statement from the Petitioner. (*Id.* at 46).

Prior to taking the statement, however, the detective asked Petitioner Bowen if he had any underwear that he normally wore. (*Id.* at 50). According to Tapp, the Petitioner went to the laundry room and pulled out some green boxers shorts which he showed the detective. (*Id.*). Detective Tapp testified that the green boxer shorts produced by the Petitioner matched the description given by J.S. of the shorts that the Petitioner wore when he allegedly abused her. (*Id.*). Detective Tapp testified that he advised Petitioner Bowen what the allegations against him were before the two men discussed the situation. (*Id.* at 51).

Detective Tapp recalled that while in the bedroom the two men discussed Bowen's masturbation and any adult magazines he might have in the bedroom. (*Id.* at 51–52). Bowen acknowledged to Detective Tapp that he did have some Playboy magazines in his dresser in the bedroom. (*Id.* at 52). Detective Tapp conceded that he had no information about any illegal pornography. (*Id.* at 52–53). Once outside in the garage, the detective advised Petitioner Bowen that he was not under arrest and that the detective intended to take a tape recorded statement. (*Id.* at 54).

On cross-examination, the detective confirmed that his investigative report indicated that he and Murray had spent approximately two hours at the home of the Petitioner that afternoon. (*Id.* at 60–61, 66). Further, he acknowledged that all but a few minutes of that 2–hour time period he spent with Petitioner Bowen. (*Id.* at 67). Detective Tapp testified that he could not recall whether he had ever told Petitioner Bowen during that two hour period that the alleged sexual offenses had occurred 7–to–9 years earlier. (*Id.* at 69). The detective also admitted that J.S. in her initial statement to him was not sure exactly where inside the Bowen home the fellatio incident occurred. (*Id.* at 70). Further, he agreed that his report indicated, contrary to her testimony, that J.S. had told him that she was "6 years old" when the Petitioner supposedly had requested that she commit fellatio again. (*Id.* at 71).

On redirect, Detective Tapp testified that Petitioner Bowen confirmed his statement to J.S. concerning the unnamed 9–year–old local girl who supposedly came over to the Bowen home and told the Petitioner that she would have sex with him if she were older. (*Id.* at 73). Detective Tapp testified that this information from Petitioner Bowen during Tapp's visit confirmed what J.S. had earlier related to

him about the Petitioner's statements to her during December of 2001. (*Id.* at 73). On re-cross-examination, Detective Tapp conceded that the Bowen home was a small, middle-class home with a kitchen that was partially visible from the front door. (*Id.* at 76–77).

This final testimony concluded the case for the prosecution. Petitioner Bowen's counsel then moved the court for a directed verdict on the sodomy charge based on the substantial inconsistencies in J.S.'s testimony as to what had occurred when and where. (*Id.* at 77). The defense also moved for a directed verdict on the sexual abuse charge arguing that sufficient evidence had not been offered by the prosecution to support the charge. (*Id.* at 78). The prosecutor responded that the testimony of J.S. concerning what allegedly occurred at the kitchen table in the home certainly constituted sodomy. (*Id.*). As for the sexual abuse charge, the prosecutor argued that the testimony concerning Petitioner Bowen allegedly forcing the girl to sit on his hand while he fondled her buttocks was sufficient testimony to go forward on this charge. (*Id.*). The trial court immediately overruled the motion for a directed verdict on the sodomy count. (*Id.* at 79). As for the sexual abuse charge, the trial court reminded counsel of the testimony from the victim that the Petitioner had masturbated on her stomach. (*Id.*). T he trial court accordingly concluded that at a minimum, sufficient circumstantial evidence had been presented such that the jury could believe that the Petitioner did commit sexual abuse in the first degree. Accordingly, the Court overruled the motion for a directed verdict on this count as well. (*Id.* at 79).

### b. Petitioner Bowen's Proof.

Petitioner Bowen then presented his case to the jury. He began with a series

of nearly 20 witnesses, all of whom were either parents with children that Petitioner's wife cared for in the Bowen home, or were adults who had observed J.S. during the relevant time period. Each parent witness testified that Mrs. Bowen had been watching his or her child or children for a number of years at her home. (*Id.* at 81). Each parent testified that his or her child was happy staying there and had never mentioned any abuse going on in the Bowen residence. Certain of the parents also testified that they had seen J.S. at the Bowen home on occasion, and that she had never mentioned any problems to them when they stopped in to pick up their children.

Many of these same parent witnesses additionally testified that they had heard the audiotape of Petitioner Bowen's statement to Detective Tapp, and that nothing they heard on the tape would change their mind about the situation in the Bowen home. These same witnesses testified that they had seen Petitioner Bowen in the home on various occasions over the years and had not seen him walking around in his boxer shorts. In fact, several witnesses, two teachers and a bus driver, testified that they were trained to recognize child abuse and had not seen anything that indicated that any children in the Bowen home were being abused.

One defense witness, a schoolteacher, testified that J.S. had attended his physical education class while she was in the fourth grade and appeared to be a well adjusted child who never mentioned anything about being abused by Petitioner Bowen at his home. (*Id.* at 148). Another witness, also one of J.S.'s teachers, testified that she had taught J.S. in music class in the fourth grade and she had never indicated any abuse at the Bowens' home. The same witness testified that her own children were cared for in the Bowen home and were very happy there. (T.E. Vol. II, pp.

152–53). None of her children reported any mistreatment. (*Id.*).

Petitioner Bowen's son, Robert Aaron Bowen, testified that he lived in the family home until he was 17. (*Id.* at 157–58). He testified that none of his own four children had ever reported any abuse or mistreatment by his father. (*Id.* at 158). Further, while growing up at home, Aaron recalled that there were always at least 5 other children being cared for in the home, which had only two bedrooms, his parents' bedroom and the bedroom that he shared with his older brother. Aaron testified that he knew J.S., whose mother would drop her off at the home in the mornings and pick her up between 4 and 5 in the afternoons. (*Id.* at 160). According to Aaron, given his father's work schedule, he was rarely at home at 3 p.m., since he did not ordinarily get back from his job as a paint mixer until 3:45 in the afternoon. (*Id.* at 161). Aaron denied that J.S. ever indicated to him that she was being abused by anyone. (*Id.* at 162).

He testified that his father never slept in the boys' bedroom, which he lived in until 1996, the final three years by himself after his older brother Matthew left to join the Navy in 1993. (*Id.* at 162–63). During that time, there were never any Playboy magazines in the dressers in the bedroom. Aaron testified that not until 2001, were there any Playboy magazines in the bedroom dresser. (*Id.* at 164). As for why J.S. might want to accuse his father, Aaron testified that she was an "attention-getter." (*Id.* at 171). Plus, her parents had gotten divorced and J.S. hated her mother's new spouse. (*Id.* at 171–172).

Another defense witness, one of the children that Mrs. Bowen formerly watched during the time that J.S. was in the home, next testified that he had never observed Petitioner Bowen make any inappropriate sexual remarks or gestures while he was

there years earlier. (T.E. Vol. IV, pp. 7–8). The same witness also never saw Petitioner Bowen inappropriately dressed inside the home. (*Id.* at 8).

Petitioner Bowen's oldest son, Matthew, also testified. Matthew testified that he and his brother, Aaron, shared the same bedroom until he left to join the Navy in 1993. (T.E. Vol. IV, p. 29). His brother then lived in their bedroom alone until he married in 1996, and moved out. (*Id.* at 30). Matthew testified that during this period his father never used the boys' bedroom as his own room, and there were never any Playboy magazines in either dresser during the time that the brothers stayed in the bedroom. (*Id.* at 30). According to Matthew, not until 2001, were there even any Playboy magazines in the home. (*Id.* at 30).

Matthew confirmed that during the time he was growing up there were always children in the home. There was no way in the 1,000 sq. ft. home to get away from the kids, who pretty much had the run of the house. (*Id.* at 31). Also, for most of the time he lived in the home, his father worked second shift at the paint factory and ordinarily left the house around 2:45 p.m. (*Id.* at 33). Matthew testified that while he lived there, J.S. never said anything about his father doing anything inappropriate to her. (*Id.* at 35). In fact, none of the other children, according to Matthew, ever indicated that his father had done anything inappropriate with them. (*Id.*). Other than J.S.'s allegations, Matthew had never heard anyone say such things about his father, who did not go around the house wearing boxer shorts. (*Id.* at 35–36).

Petitioner Bowen's ex-daughter-in-law testified next for the defense. She indicated that following her marriage to Robert Aaron in 1996, the couple lived in the Bowen home, where she never saw anything that indicated to her that any of the children being cared for was being abused. (*Id.* at 48). Further, she also observed J.S. at the time. J.S. seemed to her like a happy child, who never mentioned anything inappropriate happening to her involving the Petitioner. (*Id.* at 48). She confirmed that she never saw Petitioner Bowen wearing only his boxer shorts around the house. (*Id.* at 49).

Petitioner Bowen then testified on his own behalf. (T.E. Vol. IV, p. 49). Bowen testified that his two sons shared the bedroom in the Bowen home until the younger son left in 1996, three years after his older brother left the home to join the Navy. (*Id.* at 50–52). The house itself, explained Bowen, was a 1,000 square foot home. After both his sons left, Bowen and his wife moved out one of the beds and Petitioner Bowen moved into the bedroom in late 1996.

Bowen explained that Detective Tapp arrived at his home with the social worker that afternoon around 1:30 when Bowen was preparing to go to work. Bowen worked second shift as a paint mixer at the Olympic Stain plant, where he had worked for 18 years. (*Id.* at 53). Bowen usually prepared for work around 1:30, leaving at 2:45 p.m. (*Id.* at 54). Bowen recalled that he was shaving when the detective arrived and was only partially dressed. After a brief introduction in the kitchen area, the two men went into the bedroom where the alleged incident supposedly occurred. According to Bowen, the detective never explained to him what misconduct he had been accused of or when such misconduct occurred. Bowen simply assumed that the detective must be inquiring about recent events, rather than accusations of misconduct that allegedly occurred 7 to 9 years earlier in 1992–1995.

Bowen recalled that Detective Tapp only advised him that J.S. had made some accusations against him. (*Id.* at 72). The de-

tective did not tell him what those accusations were. (*Id.*). Instead, after being introduced, the detective immediately asked Bowen to show the detective his shorts, so the two men went to the bedroom so that Bowen could retrieve them. (*Id.* at 73). Bowen showed the detective a pair of jockey style underwear, which is the type of underwear that Bowen ordinarily wears. (*Id.* at 74). The detective then asked Bowen if he had any green shorts. Bowen responded that he had a green pair of swimming trunks and showed them to the detective. (*Id.* at 75).

Bowen recalled that as he sat on the bed in the bedroom Detective Tapp questioned him for approximately an hour. (*Id.* at 76). According to Bowen, the very first thing the detective asked was if he could remember anything inappropriate happening between him and J.S. Bowen responded that there was nothing that he could remember. (*Id.* at 76). Bowen reiterated that the detective never told him exactly what the allegations were that J.S. made against him. (*Id.* at 77). The detective did ask if there was any possibility that J.S. had seen Bowen inappropriately dressed. (*Id.* at 77). The detective also asked if he had ever masturbated in the bedroom, to which Bowen responded that he was a man and had masturbated in the bedroom. (*Id.* at 78). Tapp also asked Bowen if he had any Playboy magazines he kept in the bedroom. Bowen responded that he did have such magazines in the bedroom, but not until 2001. (*Id.* at 78).

Bowen maintains that throughout this extended interview he repeatedly denied that any type of sexual misconduct had occurred between him and J.S. The detective also asked Bowen if it was possible that J.S. had ever accidentally seen something inappropriate in the bedroom. (*Id.* at 79). By that time, Bowen simply assumed that the detective was talking about the last time that J.S. had visited the home

over the Christmas 2001 break. He speculated that perhaps she walked by the bedroom and opened the door unexpectedly. (*Id.* at 80). Detective Tapp also asked Bowen if it was possible that, while he was asleep in the bedroom, J.S. had come into the room and done something inappropriate to him. (*Id.* at 81–82). That is why, according to Bowen, his answer during the tape recorded interview about whether his penis had ever been in the mouth of J.S. was initially, "I wouldn't think so" before he immediately added, "No, not at all." (*Id.* at 81).

Bowen testified that during the entire interview Detective Tapp never informed him of the time frame during which the alleged misconduct involving J.S. occurred. (*Id.* at 83). He simply assumed that all the detective's questions related to J.S.'s visit at 2001 Christmas break, since there were never any Playboy magazines in the bedroom from 1992 until 1996, when his sons used the bedroom. (*Id.* at 83). As for any inappropriate touching, Petitioner Bowen acknowledged in his testimony that he and Detective Tapp talked about Bowen wrestling with the children and that Bowen had playfully wrestled with J.S. as he did the other children. (*Id.* at 88–89). He again adamantly denied that there was anything sexual about their play. (*Id.* at 89). Bowen testified that, in fact, children were always in the house in every room. (*Id.* at 90). According to him, they had the run of the house. (*Id.*).

At trial, Bowen adamantly denied that he had ever put his penis into the mouth of J.S., or that he had ever ejaculated onto her. (*Id.* at 57). He also denied that he had ever put his fingers in any inappropriate place on her body intentionally to sexually gratify himself or had ever exposed himself to her intentionally. (*Id.* at 57–58).

Bowen explained his relationship with J.S. to the jury. According to him, J.S.

was a "wonderful young girl" who was "like one of my own children and we treated her like one of our own children." (*Id.* at 58). Bowen recalled that J.S. was 2 years old when she arrived in their home for childcare with the other children that his wife Myrtle watched. (*Id.*).

When asked about the 1992-to-1995 time frame involved in J.S.'s allegations, Bowen testified that he was working in Louisville at Olympic Stain making the paste using in paints. (*Id.* at 61). In addition to that job, Bowen also helped hang tobacco. (*Id.* at 62). In the mornings, Bowen made extra money working at a local cemetery, Highland Memorial Gardens. (*Id.* at 63). After working at the cemetery in the early morning, he would come home, sleep for five hours, then prepare to go to work on the second shift at Olympic Stain, which began at 3:45 p.m. (*Id.* at 64). Bowen testified that he usually ate lunch between 11 a.m. and noon, and never sat down to eat at 3 p.m. in the afternoon because by that time he had already left his home to drive to his job in Louisville 20 miles away. (*Id.* at 65–66). Although Bowen did occasionally work the day shift at Olympic Stain, that shift started at 7 a.m. and ended at 3:45 p.m., so that Bowen was rarely ever home before 4 in the afternoon when he worked first shift. (*Id.* at 66). He acknowledged that sometimes when he worked second shift, J.S. was there in the mornings before he went to work. In the afternoons, she would have only been there for five minutes or so before her mother picked her up. (*Id.* at 68).

Petitioner Bowen then turned to his conversation with J.S. during the 2001 Christmas break about the 9–year–old girl who allegedly asked Bowen to have sex with her. (*Id.* at 91). Bowen recalled that the neighborhood girl came over to his house in 1985 one Saturday morning when he was watching TV with his youngest son.

(*Id.* at 92). Mrs. Bowen had gone to the grocery when she arrived. She asked where Mrs. Bowen was and then asked if she could come in and watch TV. (*Id.* at 93). As she sat on the couch watching TV, the 9–year–old allegedly turned to Bowen and blurted out, "If I was older I would f\* \* \* you." (*Id.* at 91). Bowen testified that he responded with, "What?" After she repeated the same statement, he made her immediately leave. (*Id.*). Bowen testified that he told his wife what had happened, and she subsequently told the little girl not to come back to the house while her husband was there. (*Id.* at 94–95). Bowen never saw her again.

Bowen recalled that he told J.S. about this incident in the summer of 2001, when she stopped by the house with a friend to see his wife. (*Id.* at 95). He was sitting at the kitchen table when J.S., who was then 12 or 13, supposedly told him that she had a boyfriend with whom she had had sex. (*Id.* at 97). Bowen then in the course of advising J.S. not have sex before marriage, related the story about the 9–year–old girl. (*Id.* at 97). He also acknowledged telling J.S. during the same conversation that he and his wife had not had relations for 8 months. (*Id.*). Bowen explained that he told J.S. about this abstinence because he wanted to show her that you can have meaningful relationship with your partner that is not based on sex. (*Id.* at 98). To Bowen, he simply was attempting to talk to J.S. as a father would talk to his own son or daughter. (*Id.* at 98).

On cross-examination, the prosecution extensively questioned Bowen about his conversation with Detective Tapp that afternoon in the bedroom. When asked if he began to cry when the detective questioned him in the bedroom about J.S.'s accusations, Bowen responded that he could not remember. (*Id.* at 119). Pressed further, he acknowledged that he

may have sniffled or cried. (*Id.* at 119). Bowen denied that during this encounter the detective ever told him that J.S. had accused him of masturbating on her in the same bedroom. (*Id.* at 120). Bowen did admit, however, that he told Detective Tapp that he occasionally did masturbate in the bedroom. (*Id.* at 129). He did not start using the boys' bedroom, however, until the latter part of 1996. (*Id.* at 130). Before that time, Bowen denied that he ever masturbated in the boys' bedroom. (*Id.* at 130).

Bowen reiterated that during the interview with the detective, he believed that the detective was referring to events that occurred in December of 2001. (*Id.* at 131). Bowen insisted that had he known of the time frame of the allegations, his answer on the tape concerning whether J.S.'s mouth had ever touched his penis would have been, "absolutely not," rather than "I wouldn't think so." (*Id.* at 133). Bowen acknowledged that for most of the years that J.S. was cared for in his home, she was the oldest of the children. (*Id.* at 134). As for his conversation with J.S. concerning sex, Bowen testified that he could not recall if he told his wife about the conversation. (*Id.* at 139–40). But he admitted that he never called J.S.'s mother to advise her about such conversation. (*Id.* at 141).

The prosecutor then questioned Bowen concerning the 1985 incident involving the 9–year–old girl who supposedly came to Bowen's home and said to him, "If I was a little older I would let you f* * * me." (*Id.* at 144). Bowen denied that he used the same language as the young girl when he discussed the incident with J.S. (*Id.* at 145). When asked how J.S. would have known to tell the social worker and Detective Tapp the exact words that the 9–year–old had said, if Bowen had not used the same language, Bowen responded that he did not know how J.S. would have known

what the girl said, and that she might have used her own words. (*Id.* at 146). Bowen acknowledged that he told his wife at the time about the incident, but he did not know if she ever contacted the little girl's parents. (*Id.* at 147–148). Bowen then reiterated that during the entire time that Detective Tapp was in his home, the detective never told him the exact nature of the allegations J.S. had made about him. (*Id.* at 150–51).

After Bowen answered questions about the audiotaped statement, which the prosecutor played for the jury, he acknowledged that there were times when numerous children would be in the home and he would be the only adult there. (*Id.* at 167). He also acknowledged that on most of those occasions, J.S. was the oldest child present. (*Id.*). Finally, he admitted that his wife did regularly leave to take her helper, Cindy, home. (*Id.* 167–68).

On redirect, Bowen explained that because Cindy lived on the same street, his wife was never gone for very long, perhaps ten minutes at most. (T.E. Vol. V, p. 170). Further, Bowen testified that in the 28 years he and his wife had lived in the home, no one else had ever made such allegations against him. (*Id.* at 171). Bowen explained his audiotaped statement as being the result of Detective Tapp's repeated suggestions prior to the taping of what might have happened, such as him being in the bedroom masturbating without seeing J.S. there. (*Id.* at 173). Bowen explained that before Detective Tapp made the tape, Bowen repeatedly denied that he had ever touched J.S. inappropriately or done anything inappropriate to her. (*Id.* at 174). Bowen again denied that the detective ever told him that the supposed sexual abuse occurred when J.S. was only 6 or 7 years old. (*Id.* at 174). Bowen concluded his testimony by repeating his denial that he ever touched J.S. inappro-

priately or put his penis in her mouth or his finger in her buttocks. (*Id.* at 175).

The final witness for the defense was Myrtle Bowen. (T.E. Vol. V, p. 183). She testified that she and her husband, Eddie, had lived at their home in Bullitt County for 28 years and had been married for 32 years. (*Id.* at 183–84). Mrs. Bowen had cared for children in her home for 28 of those years. (*Id.* at 184). She explained that ordinarily she would have between four and five children she cares for. (*Id.*). Mrs. Bowen confirmed that other than the charges made by J.S., there had never been any complaints by any parent or child about inappropriate touching in her home. (*Id.* at 186). In fact, Mrs. Bowen testified that she had a book for children about inappropriate touching that she read to them on occasion. (*Id.*). She explained that she told the children if they ever have a bad touch that they should tell their parents. (*Id.* at 187).

Mrs. Bowen confirmed that J.S. was 2 or 3 years old when Mrs. Bowen first began to care for her. (*Id.* at 188). Both of Mrs. Bowen's sons still lived at home when J.S. began to come there. (*Id.*). J.S. was approximately 13 years old by the last time that she came to the Bowen home in December of 2001. (*Id.* at 188). Consequently, she was cared for in the Bowen home from 1993 until approximately 2001. (*Id.* at 189).

Mrs. Bowen testified that J.S. was like her own little girl, the girl she never had. (*Id.* at 193). Mrs. Bowen accordingly treated her like a family member. (*Id.*). J.S. helped her around the home, including with the laundry, so that J.S. knew what type of clothing everyone wore. (*Id.* at 195). The final time that J.S. visited the house was during Christmas break of 2001. Mrs. Bowen offered to pay her a small sum of money to help with the children so that J.S. would have Christmas money. (*Id.* at 196). At the end of Christmas

break, J.S. asked Mrs. Bowen if she could come back to the home during spring break, but she never returned. (*Id.* at 197).

Mrs. Bowen confirmed that one or both of her sons lived in the house between 1992 and 1996, and shared a bedroom during that time. (*Id.* at 198–199). Not until her youngest son left when he married, did Mr. Bowen takeover the boys' bedroom as his own in 1996. (*Id.* at 200).

Mrs. Bowen confirmed that when Detective Tapp arrived at her home, he stated merely that there were some accusations made about her husband. He did not come out and say what the accusations were. (*Id.* at 201). The detective did immediately ask Bowen what type of shorts he had on, according to Mrs. Bowen. (*Id.* at 203–204). Mrs. Bowen then provided the social worker with the name and telephone number of all the children she could recall that she had cared for in her home. (*Id.* at 205–206). During this time, the detective and her husband were in the back bedroom for approximately an hour. (*Id.* at 206).

After the detective and social worker left, Mrs. Bowen spoke directly with each parent that came to pick up their child, as well as the parents of the other children she cared for, to tell them about the situation involving her husband. (*Id.* at 209–210). She gave each parent the choice of whether or not they wanted their child to continue to return to the home, given the accusations made. Mrs. Bowen, however, was not fully aware of the nature of the accusations, only that they involved her husband and J.S. (*Id.* at 209–210). Not until they later received a letter in the mail did they fully learn of the exact details concerning J.S.'s accusations, according to Mrs. Bowen. (*Id.* at 211). None of the parents subsequently withdrew their

children from her care after learning of the situation.

Mrs. Bowen did recall the incident in 1985 when a neighborhood girl came over to the house while she was gone and her husband let the child in. (*Id.* at 214–215). When she returned from the grocery, according to Mrs. Bowen, her husband told her that the 9–year–old girl had said that she would like to have sex with her husband. Mrs. Bowen testified that she later told the young girl never to come to her house again while her husband was there. (*Id.* at 215). As for Playboy magazines, Mrs. Bowen acknowledged that in 2001, she did order a Playboy subscription for her husband, more as a joke. (*Id.* at 215–16). No Playboy magazines, however, were in her sons' bedroom between 1992 and 1996, as there were no such magazines in her home at all during that time. (*Id.* at 216).

Mrs. Bowen recalled that she and J.S. did on one occasion discuss how far she should let a boy go when touching her. (*Id.* at 216). Mrs. Bowen recalled that she told J.S. not to let any boys touch her at age 13.(*Id.*). This conversation, according to Mrs. Bowen, took place over Christmas break. Mrs. Bowen then recalled another occasion when J.S. came to her home with a girlfriend and, while Mrs. Bowen and her friend watched TV, J.S. sat in the kitchen with her husband. (*Id.* at 218). According to Mrs. Bowen, the two girls left later that day and J.S. never gave any indication that she was upset or that anything out of the ordinary had happened. (*Id.* at 219). In fact, J.S. called Mrs. Bowen several times afterwards and asked if she could return to their house over spring break. (*Id.* at 220).

Mrs. Bowen testified that after J.S. became 5 years old she left for kindergarten at approximately 12:30 p.m. each day and did not return to the Bowen home until 4 in the afternoon. (*Id.* at 221). Ordinarily,

15 minutes after her return, J.S.'s mother would be there to pick her up. (*Id.* at 221). According to Mrs. Bowen, never at any time did J.S. ever say anything to her about her husband touching J.S. inappropriately. (*Id.* at 222). In fact, during the entire time that Mrs. Bowen knew J.S., she only saw a significant change in her behavior when her parents got divorced. (*Id.* at 224). J.S. was extremely upset and, according to Mrs. Bowen, never really got over the situation, especially when each of her parents remarried. (*Id.* at 224). J.S. told Mrs. Bowen that she did not like either of her stepparents. Mrs. Bowen testified that J.S. craved attention. (*Id.* at 225).

At the conclusion of Mrs. Bowen's testimony on cross-examination, the defense closed its case. After closing arguments, the jury retired to deliberate. Petitioner Bowen was found guilty on both counts. He waived jury sentencing and by agreement was sentenced by the trial court to concurrent terms of 5 and 20 years of imprisonment for first degree sexual abuse and first degree sodomy, respectively. As noted, the Supreme Court of Kentucky affirmed his conviction on direct appeal. His petition for certiorari to the U.S. Supreme Court was denied. This action followed.

## CONCLUSIONS OF LAW

The court first addresses the standard of review to be applied to the arguments raised by Petitioner Bowen. Because Petitioner Bowen's conviction became final well after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, the Court must apply the standard of review contained in 28 U.S.C. § 2254(d) at which the AEDPA is codified. *See, Walker v. Smith*, 360 F.3d 561, 563 (6th Cir. 2004); *Mason v. Mitchell*, 320 F.3d 604, 613 (6th Cir.2003).

Under the AEDPA, a federal court may not grant a writ of *habeas corpus* to a person in custody pursuant to a state court judgment unless the adjudication of the prisoner's claims in state court: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as defined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d)(1)(2)(2004).

■ The Supreme Court elaborated on the meaning of this statutory language in *Williams v. Taylor,* 529 U.S. 362, 405–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In so doing, the Court noted that § 2254(d) "places a new constraint on the power of the federal courts to grant a state prisoner's application for a writ of *habeas corpus* with respect to claims adjudicated on the merits in state court." *Williams,* 529 U.S. at 412, 120 S.Ct. 1495. A state court decision will be "contrary to" the precedent of the Supreme Court only if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result." *Id.* at 405, 120 S.Ct. 1495.

■ A state court opinion will violate the "unreasonable application" clause of § 2254(d)(1) when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. *See, Bell v. Cone,* 535 U.S. 685, 694–95, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)(same). A state court opinion also may be an "unreasonable application" of Supreme Court precedent if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Seymour v. Walker,* 224 F.3d 542, 549 (6th Cir.2000), *cert. denied,* 532 U.S. 989, 121 S.Ct. 1643, 149 L.Ed.2d 502 (2001).

The Supreme Court in *Williams* explained that "a federal court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495. The Court added that the term "objectively unreasonable" means that "[a] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. *See also, Price v. Vincent,* 538 U.S. 634, 638–39, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003); *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

■ When determining the "clearly established federal law," the courts may look only to the holdings of decisions of the Supreme Court of the United States at the time the petitioner's state conviction became final. *Williams,* 529 U.S. at 380, 120 S.Ct. 1495; *Abela v. Martin,* 380 F.3d 915, 924 (6th Cir.2004). It is error for the federal courts to rely solely on authority other than the Supreme Court of the United States in their analysis under § 2254(d). *Harris v. Stovall,* 212 F.3d 940, 944 (6th Cir.2000), *cert. denied,* 532 U.S. 947, 121 S.Ct. 1415, 149 L.Ed.2d 356 (2001). The decisions of lower federal courts may be considered, however, as being informative of whether a legal principle or right has been clearly established by the Supreme Court. *Smith v. Stegall,* 385 F.3d 993, 997–98 (6th Cir.2004).

 · The AEDPA affords deferential treatment to the findings of fact made by the state court during the proceedings at trial and on appeal. Specifically, 28 U.S.C. § 2254(e)(1) provides that, "[a] determination of a factual issue made by state court shall be presumed to be correct." *Id.* Further, "[t]he applicant [for § 2254 relief] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Accordingly, the factual findings of the state courts are reversed only if the petitioner establishes that they are clearly erroneous. See, *Williams v. Bagley*, 380 F.3d 932, 941–42 (6th Cir.2004); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir.2001) (presumption of correctness applies to fact findings made by a state appellate court based on the state trial record). *See also, Sumner v. Mata*, 449 U.S. 539, 546, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (holding that § 2254 makes no distinction between the factual determination of a state trial court and those of the state appellate court).

### a. Right to a Complete Defense.

Petitioner Bowen begins his legal argument with the claim that the trial court denied him his right under the Sixth Amendment to a "meaningful opportunity to present a complete defense" when it refused to grant the defense a continuance to obtain a substitute expert witness after it wrongfully excluded the proposed testimony of his sole expert, Dr. Gardner, a forensic psychiatrist and professor of child psychiatry at Columbia University. Dr. Gardner concluded in his report that the Petitioner did not exhibit any of the known indicators for pedophilia, a medically recognized sexual disorder, so that in Dr. Gardner's expert opinion it would be highly unlikely that Petitioner Bowen would commit a pedophilic act in the nature of the charged offenses. (Tr. Vol. 2, pp. 208–218). The trial court, in Petitioner's view, wrongfully excluded the proposed testimo-

ny of Dr. Gardner without conducting an adequate *Daubert* hearing based only a review of the doctor's affidavit and report.

Petitioner maintains that by summarily excluding Dr. Gardner's testimony, and then refusing to grant the Petitioner's motion for a continuance immediately prior to trial, the trial court unconstitutionally deprived Petitioner Bowen of relevant, highly probative evidence that was admissible not only to establish that Petitioner was unlikely to have committed the charged offenses, but also to rebut the unfairly prejudicial effect of the audiotaped statement of the Petitioner, which was misused by the prosecution to inflame the jury with the suggestion that references to masturbation on the tape indicated deviant sexual behavior by the Petitioner. Dr. Gardner would have testified had he survived and been permitted, that masturbation in itself is not deviant sexual behavior.

Petitioner Bowen maintains that Dr. Gardner's proposed testimony satisfied all of the *Daubert* criteria for the admissibility of scientific and technical evidence, criteria which have been liberally applied by the Kentucky courts in other cases, particularly in favor of the admission of such testimony on behalf of the prosecution in criminal cases. By summarily excluding Dr. Gardner's proposed testimony, and refusing to permit the defense a continuance to obtain a replacement expert to testify to the same conclusions, Petitioner Bowen insists that his right to a complete defense as established in *Taylor v. Illinois*, 484 U.S. 400, 410–411, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) and *Crane v. Kentucky*, 476 U.S. 683, 690–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) were violated by the trial court. The decision of the Kentucky Supreme Court to affirm the trial court in this respect, according to Petitioner, is a clearly unreasonable application of the precedent of the Supreme Court in this

area of the law. *See Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991).

Before the Court turns to address these arguments, it is important that the limited nature of the Court's role be emphasized. Petitioner Bowen directs his initial arguments to the exclusion of evidence by a state trial court in a criminal proceeding. In his view, he was denied due process by the trial court's refusal to admit the type of expert evidence proffered through Dr. Gardner, or permit the defense a continuance to obtain a substitute expert to testify to the same matters following Dr. Gardner's untimely death immediately prior to trial.

■ Our role, as a federal court conducting habeas review, is strictly limited to deciding whether a state prisoner's conviction violated the constitution, laws or treaties of the United States. *See Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). We do not sit to reexamine state court determinations on state law questions. *Id.* at 67–68, 112 S.Ct. 475. As the Sixth Circuit has frequently held, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.1983). *See also Coleman v. Mitchell,* 244 F.3d 533, 542 (6th Cir.2001) (A federal habeas court does not rule on errors in the application of state law, especially alleged errors in the admission or exclusion of evidence.). Accordingly, the mere violation by a state court of its own evidentiary law does not of itself provide a basis on which this court may grant habeas corpus relief to Petitioner Bowen. *See Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.2003).

■ Only in the exceptional circumstance when an error of state law rises to the level of a constitutional violation that results in a substantial and injurious effect or influence on the jury's verdict will habeas corpus relief be possible. *See Coleman,* 244 F.3d at 542 (When an evidentiary ruling is so erroneous that it results in the denial of fundamental fairness, it may violate due process and thereby justify habeas corpus relief.). Such errors, however, are the rare exception as "courts have defined the category of infractions that violate 'fundamental fairness very narrowly.'" *Wright v. Dallman,* 999 F.2d 174, 178 (6th Cir.1993) (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).

■ Some indication of the exceptional nature of such errors is found in the language of *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), which advises generally that state court evidentiary rulings will not rise to the level of a due process violation unless they "offend ... some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* Thus, a habeas petitioner who founds his application for relief on the basis of alleged errors in the admission or exclusion of evidence has a difficult and narrow path to follow in order to convince the federal courts that such error rendered his or her trial so fundamentally unfair as to violate due process.

Here, Petitioner Bowen argues that the exclusion of the proposed expert testimony of Dr. Gardner rendered his trial fundamentally unfair in a constitutional sense by denying him his sole expert defense, thereby reducing the trial to a mere swearing contest over events, some of which allegedly occurred nearly a decade earlier. Petitioner insists that he was thereby denied a meaningful opportunity to present a complete defense. *See Crane,* 476 U.S. at 690, 106 S.Ct. 2142 ("The Constitution guaran-

tees criminal defendants 'a meaningful opportunity to present a complete defense.' "). Because the Supreme Court of Kentucky unreasonably failed to apply the earlier-mentioned line of Supreme Court decisions including *Taylor, Crane* and *Scheffer,* Petitioner concludes that he is entitled to relief under 28 U.S.C. § 2254(d).

The Court must respectfully disagree with this position. The right to a meaningful opportunity to present a complete defense is not a means by which a defendant becomes entitled to present any nature of evidence that he or she believes is important to the case. *See Rockwell v. Yukins,* 341 F.3d 507, 512 (6th Cir.2003), *cert. denied,* 541 U.S. 905, 124 S.Ct. 1601, 158 L.Ed.2d 247 (2004) ("[T]he Supreme Court has made it perfectly clear that the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions."). Indeed, the *Taylor* decision cited by Petitioner recognizes that a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor,* 484 U.S. at 410, 108 S.Ct. 646. Defendants are instead compelled to abide by those accepted rules of evidence designed to enhance the fairness and reliability of the criminal trial process. *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

This limitation on the right to present a complete defense is best described in *Scheffer,* wherein the Supreme Court writes:

> State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve."

A defendant's right to present a "complete" defense, in other words, does not automatically trump state evidentiary rules. The competing interests must be balanced, and "a defendant's interest in presenting ... evidence may [have to] bow to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

In this instance, the Supreme Court of Kentucky concluded, based on well-established state case law, that Dr. Gardner's proposed expert testimony was properly excluded by the trial court, after an adequate *Daubert* hearing on the record, as being scientifically unreliable and irrelevant to the charged sexual abuse and sodomy offenses. In reaching this conclusion, the state Supreme Court relied upon its prior precedent in *Tungate v. Commonwealth,* 901 S.W.2d 41 (Ky.1995), in which it upheld the prior exclusion of identical proposed testimony by Dr. Gardner in an earlier criminal trial involving sexual abuse charges. Accordingly, the Supreme Court concluded that a continuance would not have affected the course of the criminal trial proceedings as any new expert tendered to give similar expert testimony concerning indicators of pedophilia, and the defendant's absence of such indicators, would have been properly excluded by the trial court. This result is in no fashion an unreasonable application of any clearly established precedent of the Supreme Court.

Kentucky, as a matter of state evidentiary law, has long excluded such profile testimony on various grounds. The Kentucky Supreme Court, over the dissent of Justice Leibson, first excluded proposed expert testimony that a defendant's psychological profile was not consistent with that of a sex offender in the case of *Pendleton v. Commonwealth,* 685 S.W.2d 549, 553 (Ky.

1985). On that occasion, the court reasoned that the admission of such propensity evidence would be improper because any such opinion on the ultimate fact would invade the province of the jury. *Id.*

Subsequently, ten years later in *Tungate,* 901 S.W.2d 41 (Ky.1995), the Supreme Court of Kentucky returned to consider the admissibility of Dr. Gardner's expert opinion that a defendant charged with sexual abuse was unlikely to be inclined to commit such acts based on the absence of 24 indicators for pedophilia. *Tungate,* 901 S.W.2d at 42–43. The Kentucky Supreme Court considered the admissibility of such pedophile profile testimony under both the former *Frye* test for the admission of scientific evidence and the current *Daubert* test. *Id.* The court ultimately concluded that under either test, *Frye* or *Daubert,* the trial court properly excluded Dr. Gardner's expert testimony as it did not satisfy even the more liberal *Daubert* standard for relevance and scientific reliability. *Id.* at 43. ("[E]ven if *Daubert* applied to this case because of the adoption of the Kentucky Rules of Evidence, the appellant did not even satisfy this more liberal standard of mere relevance and scientific reliability.").

The trial court in Petitioner Bowen's case reached the exact same conclusion that was reached in *Tungate* and affirmed on direct appeal by the Kentucky Supreme Court. The trial court found that the proposed expert testimony by Dr. Gardner that Petitioner Bowen did not exhibit the indicators for pedophilia was not relevant. Petitioner Bowen was not charged with pedophilia, as noted by the trial court. Further, the prosecutor indicated that he did not intend to, and indeed did not, use the term "pedophilia" in presenting the state's case to the jury. Thus, the determination by the trial court that the pedophile profile expert testimony of Dr. Gardner was not relevant in the sense of meaningfully helping the jury determine whether or not Petitioner Bowen sexually abused or sodomized J.S. was not an error of state evidence law, much less an error so egregious as to implicate the Petitioner's right to a fundamentally fair trial.

Petitioner Bowen suggests that the decision of the Kentucky Supreme Court is in some fashion an improper application of *Daubert* and contrary to at least one federal court decision involving the admission of profile evidence under the Federal Rules of Evidence in *United States v. Romero,* 189 F.3d 576, 581–88 (7th Cir.1999), *cert. denied,* 529 U.S. 1011, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000) (upholding the decision of a federal trial court to allow an FBI agent to testify to the four general traits exhibited by preferential sex offenders). Petitioner Bowen suggests that *Romero* provides, in the words of *Rashad v. Walsh,* 300 F.3d 27, 35 (1st Cir.2002) a "valuable reference point" for the application of the law under similar factual circumstances.

One might well ask, however, what "law" is being referenced. *Romero* focuses on the question of whether the trial court abused its discretion in its application of *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) by admitting the testimony of the FBI agent concerning the *modus operandi* of modern child molesters. *Romero,* 189 F.3d at 585. *Romero* did not arise in the context of a federal habeas corpus proceeding under 28 U.S.C. § 2254(d), nor did it involve a discussion of a criminal defendant's right to a complete defense or whether a trial court unreasonably applied Supreme Court precedent to deny such constitutional right. Indeed, in *Romero,* the defendant failed to timely object to the FBI agent's testimony, which resulted in the Seventh Circuit reviewing the admission of such testimony under the Federal

Rules of Evidence for the equivalent of palpable error resulting in a miscarriage of justice. *Id.* at 585.

Even under this more restrictive standard, the Seventh Circuit acknowledged that the defense had legitimate concerns over the admission of such testimony, concerns which the appellate court, however, could not reach under the more restricted standard, given the failure of defense counsel to timely object at trial. Accordingly, whatever reference point that *Romero* may offer, the decision does not point the Court toward the correct resolution in this case since it focuses not upon clearly established constitutional precedent, but rather upon *Daubert* and FRE 704(b), which the Seventh Circuit acknowledges that it has taken "a somewhat more lenient approach to this type of testimony" than the other federal circuits. *Id.* at 586.

If this Court is to look for signposts, or other points of judicial reference, then it would seem that the *Pendleton* and *Tungate* decisions would be the most obvious judicial landmarks insofar as this Court's duty to determine whether the Kentucky Supreme Court, in affirming the exclusion of Dr. Gardner's proffered expert testimony, arbitrarily and irrationally acted in violation of Kentucky's established evidence rules so as to render Petitioner Bowen's trial fundamentally unfair in a constitutional sense. When one does look to *Pendleton* and *Tungate,* it becomes immediately apparent that the Kentucky Supreme Court decision in this case worked no unreasonable application of clearly established United States Supreme Court precedent. Rather, the Kentucky Supreme Court merely continued to follow what was well-established evidence law in the state.

Indeed, the Court notes that the view of the Kentucky courts concerning the exclusion of pedophile profile testimony is by far and away the majority view among all the state courts, which routinely exclude expert testimony of the nature initially offered through Dr. Gardner. *See Delaware v. Floray,* 715 A.2d 855, 858 n. 8 (Del.1997) (" '[a] majority of the courts that have considered the issue [of pedophile profile testimony] have rebuffed attempts on the part of the state as well as the defendant to present [expert] testimony of this kind.' ") *See also, Louisiana v. Hughes,* 841 So.2d 718, 721 (La.2003) ("[T]he overwhelming weight of recent authority in other state jurisdictions considering the question of whether the accused may present expert testimony that he is psychologically unlikely to commit the charged offense has been to exclude expert evidence offered by the defendant in cases of child sexual abuse to establish that he does not fit the profile of a sexual predator or pedophile, or that his responses to standardized psychological tests failed to disclose any underlying sexual pathology or sexual deviancy that might explain sexual abuse of children.") (citing numerous state court decisions); *see gen.* James N. Peters and William D. Murphy, *Profiling Child Sexual Abusers, Legal Considerations,* 19 Crim.Justice and Behavior, 38, 39 (1992) ("With the notable exception of courts in California ... virtually every appellate court that has ruled on the admissibility of expert testimony regarding the psychological profile of child molesters has rejected it.").

As the *Hughes* and *Floray* decisions reveal in their in-depth examination of the state of the law on the admission of such expert testimony, the majority view among the states, including Kentucky, is to reject the admission of proffered expert testimony that a criminal defendant is unlikely to engage in sexual misconduct because he or she fails to exhibit certain indicators that the expert has determined are associated either with pedophilia or sexual abuse. While these state court decisions, cata-

logued in *Hughes* and *Floray* are certainly not binding on this Court, they underscore the conclusion that Kentucky has not irrationally, arbitrarily or indiscriminately misapplied a rule of state evidence law so as to deny Petitioner Bowen his right to a fundamentally fair trial and a meaningful opportunity to a complete defense through the exclusion of Dr. Gardner's proffered testimony.

■ One final matter bears mention before the Court turns to Petitioner Bowen's next argument. The Petitioner challenges the process by which the trial court concluded that Dr. Gardner's testimony failed to satisfy the dual *Daubert* requirements of reliability and relevancy. Petitioner insists that the trial court's exclusive reliance on the record to conduct its *Daubert* analysis was *not* a *Daubert* hearing and that to the extent the Supreme Court of Kentucky opined otherwise in its decision affirming on appeal such a conclusion was an unreasonable determination of fact.

Once again, the Court must respectfully disagree with this position. Both the trial court and the Supreme Court of Kentucky relied explicitly on *Commonwealth v. Christie*, 98 S.W.3d 485, 488–89 (Ky.2002) and its holding that, "A trial court should only rule on the admissibility of expert testimony without first holding a hearing 'when the record [before it] is complete enough to measure the proffered testimony against the proper standards of reliability and relevance.'" *Id.* (citing *Jahn v. Equine Services PSC*, 233 F.3d 382, 393 (6th Cir.2000)). *Christie* adds that "Usually, the record upon which a trial court may make an admissibility decision without a hearing will consist of the proposed expert's reports, affidavits, deposition testimony, existing precedent and the like." *Id.* (citing *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124, 1139 (9th Cir.2002); *Oddi v. Ford Motor Co.*, 234

F.3d 136, 151 (3rd Cir.2000), *cert. denied*, 532 U.S. 921, 121 S.Ct. 1357, 149 L.Ed.2d 287 (2001)).

Not only was the trial court aware of the *Christie* decision and its holding, the trial court read aloud from the decision immediately prior to its *Daubert* ruling. In reaching its decision, the trial court noted that it had read the report of Dr. Gardner, which was made a part of the record, along with Dr. Gardner's detailed affidavit. Thus, while no evidentiary hearing was held in the sense that additional testimony was taken, the substance of Dr. Gardner's expert opinion was before the court in depth and the court was well aware of both the *Pendleton* and *Tungate* decisions, which were argued to the court prior to its ruling excluding the proffered expert opinion.

Under these clear cut circumstances, the Kentucky Supreme Court reasonably found that the trial court had conducted an adequate *Daubert* proceeding. This Court finds nothing unreasonable in that conclusion, given the state court record and the *Christie* decision relied on by both the trial and appellate state courts. For the above reasons, the Court concludes that the Supreme Court of Kentucky did not unreasonably apply the clearly established precedent of the United States Supreme Court when it affirmed the decision of the trial court to exclude the proffered expert testimony of Dr. Gardner that Petitioner Bowen lacked the necessary indicators to be considered a pedophile and therefore was less likely to commit pedophilic sex acts.

**b. Sufficiency of the Evidence.**

Petitioner Bowen in his second argument maintains that the evidence presented at trial by the state was constitutionally insufficient to support his conviction for sexual abuse in the first degree or sodomy in the first degree. Petitioner Bowen

maintains that the uncorroborated testimony of the victim, J.S., a 14–year–old girl, on events that occurred seven-to-nine years earlier when she was four-to-seven years old, was so inconsistent and contradictory that no rational trier of fact could have found the essential elements of either crime beyond reasonable doubt under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). To the extent that the Supreme Court of Kentucky held otherwise, Petitioner Bowen maintains that such decision was an objectively unreasonable application of the clearly established *Jackson* standard. In fact, Petitioner Bowen suggests that the language used by the Kentucky Supreme Court in its opinion indicates that the court failed to apply the *Jackson* standard, instead asking only if it would be reasonable for a jury to find guilt under the facts, rather than whether the evidence was sufficient to justify a "rational trier of fact to find guilt beyond a reasonable doubt." *See In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Petitioner maintains that the discrepancies in the testimony of J.S. were so substantial, and the contradictions between her testimony and pretrial statements so extensive that no rational trier of fact could have found guilt beyond a reasonable doubt.

■ Once again, we must look to the clearly established precedent of the U.S. Supreme Court to determine whether the Kentucky Supreme Court decision was contrary to, or an unreasonable application of, that precedent. *See Williams*, 529 U.S. at 404–05, 120 S.Ct. 1495. Under the standard of *Jackson*, habeas corpus relief will be appropriate based on a claim of insufficient evidence only when the Court finds, after examining all of the evidence in a light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the charged offenses beyond a reasonable

doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. When a reviewing court has before it a record of historic facts that support conflicting inferences, the court must presume that the trier of fact resolved all such conflicts in favor of the prosecution and must defer to that resolution. The court does not ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt, nor does it make its own assessments of the weight of the evidence. *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781 (citing *Woodby v. INS*, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). *See also Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir.2003), *cert. denied*, 540 U.S. 1158, 124 S.Ct. 1145, 157 L.Ed.2d 1057 (2004).

■ Assessment of the credibility of the witnesses is beyond the scope of federal habeas corpus review of a claim of insufficient evidence. *Matthews v. Abramajtys*, 319 F.3d 780, 788–89 (6th Cir.2003) (citing *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir.2000)). Additionally, circumstantial evidence standing alone if competent, may support a guilty verdict and is not required to eliminate any reasonable hypothesis except that of the defendant's guilt. *United States v. Talley*, 194 F.3d 758 (6th Cir.1999), *cert. denied*, 528 U.S. 1180, 120 S.Ct. 1217, 145 L.Ed.2d 1118 (2000). The consequence of the above case law involving the *Jackson* standard for insufficiency of the evidence is that a habeas petitioner who challenges the sufficiency of the evidence bears "a very heavy burden." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2nd Cir.2002). *See also Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

The Court must begin its sufficiency of the evidence analysis with explicit reference to the substantive elements of the

charged criminal offenses as they are defined by state law. *Parker v. Renico,* 506 F.3d 444, 447–48 (6th Cir.2007); *Geboy v. Brigano,* 489 F.3d 752, 762 (6th Cir.2007) ("[T]his standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'") (citing *Jackson,* 443 U.S. at 324 n. 16, 99 S.Ct. 2781). Here, Petitioner Bowen was charged with two criminal offenses. One of these offenses was sodomy in the first degree as defined in the Criminal Code of the Kentucky Revised Statutes (KRS) at KRS 510.070(1). This statute provides that a person is guilty of sodomy in the first degree when he engages in deviant sexual intercourse either by forcible compulsion or with another person who is incapable of consent because he or she is physically helpless or is less than 12 years old. KRS 510.070(1)(a)-(b) (West 2007). Sodomy in the first degree in Kentucky is ordinarily a Class B felony unless the victim is under 12 years old or receives a serious physical injury in which case the offense is a Class A felony. See KRS 510.070(2) (West 2007). Deviant sexual intercourse, as defined by KRS 510.010(1) includes any act of sexual gratification that involves the sex organs of one person and the mouth or anus of another. *Id. See Bills v. Commonwealth,* 851 S.W.2d 466 (Ky.1993) (Penetration is not required under the sodomy statute to constitute fellatio as "mere contact" between the penis and mouth constitutes deviant sexual intercourse); *Hulan v. Commonwealth,* 634 S.W.2d 410 (Ky.1982) (same).

▮ In Kentucky, sexual abuse in the first degree is statutorily defined by KRS 510.110. The statute provides that a person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact by forcible compulsion or subjects another person to sexual contact who is incapable of consent due to physical or mental incapacity or due to being less than 12 years of age. KRS 510.110(1)(a)-(b) (West 2007). Sexual abuse in the first degree is ordinarily a Class D felony unless the victim is less than 12 years old, in which case the offense is a Class C felony. KRS 510.110(2). "Sexual contact" is defined by KRS 510.010(7) to mean any touching of the sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either party. *Id.* Under Kentucky case law, an actual touching is required to satisfy the statutory definition of sexual contact, but the contact need not be direct with the body. *Turney v. Commonwealth,* 159 S.W.3d 818 (Ky.App.2004); *Bills v. Commonwealth,* 851 S.W.2d 466, 471 (Ky.1993) (The statutory definition of sexual contact encompasses parts of the body of the victim other than his or her sexual organs alone).

The Court has examined the opinion of the Kentucky Supreme Court at pages 11–12, where the court addresses the Petitioner's motion for a directed verdict. In discussing the standard for review, the Kentucky Supreme Court cites *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991) for its test of whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* This test of *Benham* was taken directly from *Commonwealth v. Sawhill,* 660 S.W.2d 3, 4 (Ky.1983), which incorporates reference to *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This Court, accordingly, finds no indication that the Kentucky Supreme Court departed from the *Jackson* test for insufficiency of the evidence. Instead, it appears merely that the language of the opinion does not directly parrot the language of *Jackson.*

Nevertheless, the opinion clearly applies the appropriate standard when it holds that a rational trier of fact could have believed based on J.S.'s testimony that Petitioner Bowen committed the charged

offenses. Nothing about this conclusion or the constitutional standard applied by the Kentucky Supreme Court appears to the Court to be clearly contrary to, nor an unreasonable application of, the *Jackson* standard.

■ J.S. testified at trial that when she was approximately four years of age the Defendant forced her mouth onto his penis so that she gagged and began to cry. Only then did the Petitioner release her according to J.S.'s testimony. J.S. similarly testified that on a separate occasion the Petitioner masturbated over her, ejaculating onto her stomach, as she lay on a bed in the back bedroom of the home. She testified additionally that on numerous occasions the Petitioner would force her to sit on his hand so that her clothed buttocks touched his hand; although she denied that his fingers were inserted into her rectum. This testimony, which the Court is bound to accept as being true, is sufficient to satisfy all the material elements of both the aforementioned sodomy and sexual abuse statutes, respectively.

■ The Court is well aware that J.S. was uncertain as to the exact location of the incident involving fellatio, as well as the exact time at which such incident occurred. Her testimony also was inconsistent insofar as she initially testified that the Petitioner attempted again to solicit fellatio when she was six years old, as reported in her statement to Detective Tapp. At trial, however, she testified inconsistently with that statement, indicating that she was not 6, but 12 years of age when the Petitioner solicited her for oral sex.

The Court also is aware that J.S. delayed for an extended number of years in reporting her abuse and that her outward demeanor, according to witnesses offered by the defense, was not indicative of any such abuse, nor did she make any statements about abuse prior to March of 2002.

The testimony of certain defense witnesses also suggested that the bedroom was not occupied by the Petitioner at the time of the alleged masturbatory incident and that the Petitioner would not likely have been home from work at the time of the afternoon that J.S. recalled the incident to have occurred.

All of these facts certainly run to the weight that a juror might give to the testimony of J.S. None of these inconsistencies, however, would preclude a rational trier of fact from finding the essential elements of a crime beyond reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Certainly, it cannot be said that the Supreme Court of Kentucky was unreasonable in so holding.

Many courts have affirmed the criminal convictions of defendants accused of child sexual abuse by minor witnesses whose testimony varied as to time, location and manner of offense. These inconsistencies in the cases set forth below were held to be merely matters for the jury to consider in reaching its verdict.

For example, in *Williams v. McCoy*, 7 F.Supp.2d 214, 221–22 (E.D.N.Y.1998), a New York habeas petitioner was convicted of the rape of his ex-girlfriend's nine-year-old daughter. *Id.* at 217. The young victim testified that on one occasion the petitioner came to her room while she was sleeping, pulled down her gown and sweat pants and then lowered his shorts and rubbed his penis until he ejaculated onto his stomach. *Id.* He then rubbed her breasts and inserted his penis into her vagina, according to the victim. *Id.* This trial testimony was in certain respects inconsistent with the victim's pretrial statements to Child Protective Services personnel, whom she told that the petitioner covered his mouth with his hands, touched her breasts, put his fingers into her vagina, masturbated to orgasm and then

rubbed her vagina again. *Id.* at 217–18. Subsequent medical examination of the victim was essentially normal without sign of a sexual abuse except for abnormal vagina discharge which was considered consistent with a diagnosis of chlamydia. *Id.*

Following conviction, petitioner argued that the evidence was insufficient to support his conviction for rape, given the direct inconsistency of the victim's trial testimony with her previous statements to medical personnel. The trial court rejected the petitioner's insufficiency of the evidence argument, holding that such discrepancies were for the jury to evaluate as part of their credibility determination and that the absence of evidence of penile penetration was not fatal to the prosecution's proof. *Id.* at 221–222.

In *Hogan v. West,* 448 F.Supp.2d 496, 512–513 (W.D.N.Y.2006), the District Court for the Western District of New York reviewed the convictions of a habeas corpus petitioner for first degree rape, second degree rape, first degree sodomy, second degree sodomy and first degree sexual abuse. The petitioner in *Hogan* argued that the evidence offered at trial was insufficient under *Jackson* to support his conviction on the charged offenses. The district court held that the state courts were not unreasonable in rejecting this argument, even though the victim, the petitioner's minor sister-in-law, presented no medical evidence to confirm that she was repeatedly raped, delayed coming forward for 18 months before making her accusation, continued to associate with the petitioner during this time after she was allegedly victimized, and gave testimony inconsistent in certain respects with her story of abuse. *Id.* at 512–513. The district court explained, "Hogan's argument boils down to this: the jury should have believed his version of events rather than the testimony offered by the victim and the other prosecution witnesses. Howev-

er, this Court is not free to second guess the jury's credibility determinations." *Id.* at 512–513 (citing *Huber v. Schriver,* 140 F.Supp.2d 265, 277 (E.D.N.Y.2001)).

The same is true here. Petitioner Bowen's arguments regarding the insufficiency of the evidence may be distilled to the proposition that the jury was mistaken in crediting the version of events offered by J.S., rather than the Petitioner's version of events, give the inconsistencies in the testimony of J.S. As earlier noted, the role of this Court is not to reassess the credibility determinations of the jury. The jurors were free to believe J.S., despite the various inconsistencies in her testimony, and it cannot be said that no rational juror would find the Defendant guilty of the charged offenses when the evidence is examined in a light most favorable to the state. Because the decision of the Supreme Court of Kentucky in this respect is neither contrary to nor an unreasonable application of the *Jackson* standard for sufficiency of the evidence, the Petitioner is not entitled to relief.

**c. Admission of the Tape Recorded Statement.**

Petitioner Bowen in his third and final argument focuses on the admission of his audiotape recorded statement taken by Detective Tapp. He now argues that this statement, which included undated references to masturbation in the bedroom where the alleged sexual offense occurred, was both irrelevant to the charges and unfairly prejudicial, so much so as to deny him a fundamentally fair trial in violation of due process. Petitioner Bowen maintains in this regard that the analysis of the Kentucky Supreme Court in its opinion affirming on this issue is in conflict with its own case law and rests upon a clearly unreasonable determination of the facts in light of the trial evidence presented.

Petitioner offers several examples of such unreasonable factual determinations in the opinion of the Kentucky Supreme Court. Specifically, he challenges the Supreme Court description of portions of the tape recorded statement as indicating that the Petitioner: (1) masturbated in the bedroom "all the time" and "during the same time that [J.S.] was napping there;" (2) acknowledged it was "very possible" that he unknowingly masturbated while J.S. was napping in the room; (3) stored pornographic materials in his sons' bedroom, thus corroborating J.S.'s statements to Detective Tapp; (4) discussed his past conduct in making his audio recorded statements; and (5) discussed his proclivity for masturbation in his sons' bedroom, as opposed to his own bedroom.

Petitioner maintains that the decision of the Supreme Court of Kentucky is not only contrary to Kentucky's own case law arising under KRE 401, 403 and 404(b), but is dependent on the concept of a "qualified confession," an oxymoron that is nonexistent in the law. Petitioner's recorded statement, far from being in any sense a confession, was instead entirely irrelevant as tending only to suggest that the Petitioner masturbated, a noncriminal act that the prosecution misused to unfairly portray Petitioner Bowen as a sexual deviant, thereby rendering his entire trial so fundamentally unfair as to constitute a denial of due process. *See Clemmons v. Sowders,* 34 F.3d 352, 356 (6th Cir.1994).

Once again, these arguments must be viewed in the context of our doubly narrow scope of review. We are limited both by the *Williams* decision and its establishment of the AEDPA standard of review and also by the extremely restricted review accorded for alleged errors in the omission or exclusion of state law. The AEDPA standard of *Williams,* 529 U.S. at 411, 120 S.Ct. 1495, prohibits this Court from issuing a writ of habeas corpus, even

if it believes in the exercise of its independent judgment that the Kentucky Supreme Court applied clearly established federal law erroneously. *Id.; Parker v. Renico,* 506 F.3d at 447–48 (discussing *Williams v. Taylor,* 529 U.S. 362, 404–412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The state court decision must not only be wrong, but it must also be unreasonable, as well. *Id.*

In addition to this highly deferential AEDPA standard, one cannot forget the cautionary language of *Estelle,* 502 U.S. at 68, 112 S.Ct. 475, which bluntly states that habeas corpus relief is not available for mere errors of state law, unless the error is so extreme, pervasive and crucial to the trial proceedings that it had a substantial and injurious effect or influence in determining the verdict of the jury. *See Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Put differently, even if an error in the admission or exclusion of state law rises to the level of a constitutional violation, it may be corrected only when such error is sufficiently serious to satisfy the *Brecht* standard.

Here, examination of the opinion of the Kentucky Supreme Court reveals no unreasonable application of the clearly established precedent of the U.S. Supreme Court or unreasonable determination of the facts in light of the evidence presented at trial. See 28 U.S.C. § 2254(d)(2) (West 2007). To the contrary, examination of the state Supreme Court opinion shows that the state court acted in an entirely reasonable fashion that transgressed no clearly established Supreme Court precedent nor did the opinion rely on an unreasonable determination of the facts established at trial.

To appreciate the nature of the Kentucky Supreme Court ruling, one must keep in mind the nature of the alleged sexual misconduct, along with the respons-

es of the Petitioner recorded on the audio taped statement taken by Detective Tapp. The prosecution charged that Petitioner Bowen, while located in the bedroom of his home, masturbated above the prone figure of the victim as she lay napping, ultimately ejaculating onto her stomach. During the tape recorded statement, Petitioner Bowen acknowledged that he had masturbated in the very same bedroom where the offense allegedly occurred. He acknowledged that it was "very possible" that he had masturbated while the victim J.S. was napping in the bedroom. He further acknowledged that he kept Playboy magazines in the bedroom, a fact which was corroborative of a portion of the victim's information to Detective Tapp that the Petitioner kept such magazines in the bedroom.

The Supreme Court of Kentucky, therefore, quite reasonably concluded that the contents of the audio recorded statement were relevant within KRS 401 ("Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). As the Court noted, under Kentucky case law, a showing of relevancy requires only that the party who tenders the evidence show "a slight increase in probability." *Blair v. Commonwealth*, 144 S.W.3d 801, 808 (Ky.2004). The challenged pretrial statement of the Petitioner readily satisfies Kentucky's own standard for relevancy.

Petitioner insists that any relevancy was extraordinarily minimal given the Petitioner's claimed misunderstanding of the timeline for the alleged misconduct. Petitioner maintained throughout the trial that he was never properly advised by the detective *when* the alleged misconduct occurred. Had he known that the supposed sexual abuse and sodomy was alleged to have occurred in the mid–1990's, as opposed to

December of 2001, which he errantly assumed was the appropriate date, Petitioner maintains that his answers would have been materially different, a fact that he made known to the jury in his testimony. Accordingly, he maintains that the unfair prejudice from the statement was so severe and pervasive as to render his trial fundamentally unfair in the constitutional sense.

The Supreme Court of Kentucky concluded otherwise. It reviewed the nature of the tape recorded statement against the Petitioner's claim of unfair prejudice and found that the taped statement was sufficiently probative to be admissible under both KRE 401 and 403. We do not sit to reevaluate this judgment. To the extent that our opinion is at all relevant, the state Supreme Court's decision appears imminently reasonable in light of the nature of the charges and the content of the taped statement.

As for the Petitioner's argument that omission of the statement was error under KRE 404(b), the Court must again emphasize that its role is not to redetermine whether, as a matter of state law, the taped statement ran afoul of KRE 404(b). Frequently, the Sixth Circuit has declined to grant habeas corpus relief based on the argument by a state prisoner that the admission of evidence of prior uncharged crimes, misconduct or acts rendered his or her trial fundamentally unfair.

For example, in *Bugh v. Mitchell*, 329 F.3d 496, 511–512 (6th Cir.2003), an Ohio petitioner convicted of raping his 4–year-old daughter challenged the fundamental fairness of his trial based on the admission of testimony concerning a separate episode in which the petitioner allegedly abused his stepson and the daughter of a business client ten years earlier. *Id.* at 511.

The Ohio state courts held the prior bad acts evidence to be admissible under Ohio

evidence law. In rejecting the Petitioner's constitutional challenge based on the admission of such evidence, the Sixth Circuit not only reminded the Petitioner of the very narrow definition of those evidentiary rulings that violate fundamental fairness, it continued to advise that "there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Id.* at 512–13 (also observing that while the Supreme Court has addressed prior acts testimony under the Federal Rules of Evidence, "it has not explicitly addressed the issues in constitutional terms.").

The Sixth Circuit subsequently noted the absence of clearly established Supreme Court precedent on this exact issue in *Bey v. Bagley*, 500 F.3d 514, 521–23 (6th Cir. 2006), in which an Ohio petitioner convicted of the murder of a Toledo small business owner challenged the fundamental fairness of his trial based on the admission of testimony concerning a prior murder conviction of the Petitioner involving similar circumstances. *Id.* The Ohio courts found the circumstances of the two murders sufficiently similar to be admissible on the question of identity. On habeas review, the Sixth Circuit, citing *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), emphasized the broad authority of the states over the procedures by which they conduct criminal trials. *Id.* at 521. *See also Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ("The due process clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.").

The Sixth Circuit in *Bey* also cited *Bugh* to observe that the Petitioner had not presented nor had the Court discovered any Supreme Court precedent that indicated that a state court violates the due process rights of a criminal defendant when it

properly admits evidence of a defendant's other bad acts. *Id.* at 520. Thus, the Sixth Circuit held that the decision of the Ohio Supreme Court to affirm the admission of the other acts testimony under Ohio Rule of Evidence 404(b)—combined with the inability of the habeas court to reconsider the state court's state law based decision—"would appear to defeat [the petitioner's] claim." *Id.* at 520.

The same can be said with equal force in the present case. We have no authority to tell the Kentucky Supreme Court that it has misinterpreted its own rules of evidence, nor is there any clearly established Supreme Court precedent which holds that the otherwise proper admission of such prior acts evidence may be a constitutional violation. Further, Petitioner Bowen's claim that the admission of his taped statement had an unconstitutionally substantial and injurious effect or influence on the verdict of the jury is highly unlikely given the evidence presented by the defense. As the Sixth Circuit noted in *Bey:*

> [A]ll evidence tending to prove guilt is prejudicial to a criminal defendant. If it were otherwise, the State would not produce it as evidence and the court would not admit it as relevant. The credible point ... is that nothing in the record indicates that the prejudice was *unfair*. Defense counsel was fully apprised, well prior to trial, that this evidence would be introduced; counsel had a full and fair opportunity to challenge this evidence, cross-examine witnesses, and present rebuttal evidence.

*Bey,* 500 F.3d at 522.

The same is true here. Petitioner's trial counsel was well aware prior to trial that the prosecution intended to introduce the audio recorded statement. The trial court ruled the statement to be relevant prior to trial, and the defense was well prepared to address the weaknesses in the statement.

Petitioner Bowen emphasized in his testimony, as noted, that he was never adequately advised of the nature of the accusations, which he misunderstood to be of a more recent nature. He also testified to the jury concerning the nature of Detective Tapp's hypothetical questions which led him to assume incorrectly that the allegations related to more recent events. Additionally, the defense did an excellent job of diluting the impact of the statement by putting on witness after witness who testified that they had heard the contents of the tape recorded statement and such contents did not cause them to change their opinion of the Petitioner, nor to remove their children (for those witnesses whose children were in the care of the Petitioner's wife) from the home of the Petitioner. Even though the same witnesses were pressured on cross-examination to reconsider their testimony, they held firm that the tape recorded statement had no impact on their decision to keep their children in the care of the Petitioner's wife or to revise their opinion of the Petitioner.

Petitioner's counsel also did an outstanding job of bringing out fully all of the alleged inconsistencies that surrounded the victim's version of events. The jury was made aware that the Petitioner's sons, one or both, occupied the room until 1996, *after* the alleged masturbation incident occurred. The jury also was advised that no Playboy magazines were kept in the bedroom until 2001, also well after the alleged offenses occurred. The jury learned that the Bowen home was small, the rooms easily accessible, and children had free run of the house, thus reducing the likelihood that the Petitioner would attempt to sexually violate J.S. The jury also heard of the conflicting time schedules arising from the Petitioner's job as a second shift worker and the victim's kindergarten schedule. They learned of the absence of any prior accusations by the victim, or any other

child, against the Petitioner, as well as the victim's continued presence in the home, well after the alleged offenses occurred and the absence of any change in her demeanor during that time. Yet, with full awareness of all of these circumstances, the jury chose to credit the testimony of J.S. concerning the alleged acts of sexual abuse and sodomy.

Petitioner Bowen's disagreement with the outcome of the proceedings, and the ruling of the Kentucky Supreme Court on appeal in this final respect simply is not grounds on which habeas corpus relief may be granted. *Bey*, 500 F.3d at 523 ("Bey has offered nothing more than his disagreement with the Ohio Supreme Court's ruling that the 'other acts' evidence was properly admitted. Bey's personal disagreement is not cognizable on federal habeas review, inasmuch as it involves no constitutional dimension."). Because Petitioner Bowen's arguments concerning the admission of the taped statement are not of a "constitutional dimension," but rather are indicative merely of his disagreement with the outcome on appeal, this Court must recommend that his petition for habeas corpus relief be dismissed with prejudice.

### d. Certificate of Appealability.

■ The final question to be addressed is whether Petitioner Bowen is entitled to a certificate of appealability under 28 U.S.C. § 2253(c). Under § 2253(c)(2), a district court will grant a certificate of appealability only for those issues, or that issue, raised in a habeas corpus petition if the petitioner has made a substantial showing of the denial of a federal constitutional right. *See Harbison v. Bell*, 503 F.3d 566, 568–69 (6th Cir.2007) (Petition for Cert filed Dec. 21, 2007). This standard will be satisfied when a petitioner demonstrates to the satisfaction of the

court that reasonable jurists could disagree with the district court's resolution of his constitutional claim or claims, or alternatively, that jurists could conclude that the issues raised are adequate to deserve further review. *Banks v. Dretke,* 540 U.S. 668, 705, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (citing *Miller–El v. Cockrell,* 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). Further, § 2553(c)(3) requires that the certificate "indicate which specific issue or issues" show the denial of a constitutional right. *See Hill v. Mitchell,* 400 F.3d 308, 329 (6th Cir.), *cert. denied,* 546 U.S. 1039, 126 S.Ct. 744, 163 L.Ed.2d 582 (2005).

Examination of the issues raised in the present petition indicates to the Court that none of the three issues raised by the Petitioner meets the standard of 28 U.S.C. § 2253(c)(2) in that reasonable jurists could not disagree with the proposed resolution of the Petitioner's constitutional claims in this recommendation.

■■■ The ruling of both the trial court and the Kentucky Supreme Court on the exclusion of the proffered expert testimony of Dr. Gardner is in direct accordance with the controlling Kentucky precedent announced in the *Pendleton* and *Tungate* decisions; moreover, the Kentucky courts' view on the admissibility of such expert testimony is apparently the majority view among the state courts, as well. The testimony of J.S., when examined under the *Jackson* standard for sufficiency of the evidence, is more than adequate to support the Petitioner's conviction for sexual abuse in the first degree and sodomy in the first degree, given that her testimony must be taken as true and all inconsistencies in the evidence resolved in favor of the prosecution. Finally, this Court cannot reevaluate the admissibility of the taped statement of the Petitioner under the Kentucky Rules of Evidence, nor does any clearly established U.S. Supreme Court precedent exist

that would entitle the Petitioner to habeas corpus relief based on the otherwise proper admission of bad acts evidence, as the *Bey* and *Bugh* decisions confirm. Accordingly, the Magistrate Judge shall also recommend that the Petitioner be denied a certification of appealability as reasonable jurists could not differ that Petitioner has failed to substantially show the denial of a constitutional right.

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the petition be **DISMISSED WITH PREJUDICE** and that the Petitioner be **DENIED** a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).